**John C. CARDIN, Plaintiff-Appellee,**

v.

**Joseph B. De La CRUZ, et al., Defendants-Appellants.**

No. 80-3244.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 8, 1981.

Decided March 15, 1982.

Michael P. O'Connell, Taholah, Wash., for defendants-appellants.

James Davenport, Timothy R. Malone, Olympia, Wash., for plaintiff-appellee.

Edward J. Shawaker, Washington, D. C., amicus curiae, for U. S.

* Honorable Richard B. Kellam, Senior District Judge for the Eastern District of Virginia, sitting by designation.

Before PREGERSON and POOLE, Circuit Judges, and KELLAM,* District Judge.

PREGERSON, Circuit Judge:

This is an appeal from an order of the United States District Court for the Western District of Washington enjoining appellants, officers of the Quinault Indian Tribe ["the Tribe"], from enforcing tribal building, health, and safety regulations against appellee. Appellee, a non-Indian, owns land within the Quinault Reservation on which he operates a store that allegedly violates tribal regulations. The district court enjoined enforcement of these regulations against appellee after concluding, in light of *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978), that the Tribe lacked jurisdiction to enforce its regulations against a non-Indian on land he owned in fee. For the reasons explained below, we disagree and accordingly reverse.

## BACKGROUND

Appellee, plaintiff below, is a non-Indian who owns a thirty-acre tract in the village of Queets in Jefferson County, Washington, located within the boundaries of the Quinault Indian Reservation. On the tract, which has been owned in fee by non-Indians since 1928, is the village's only grocery and general store. Even before appellee purchased the tract in October 1978, the Tribe had urged the store's previous owner to correct certain alleged dangerous and unsanitary conditions that purportedly violated tribal building, health, and safety regulations.[1] When appellee bought the land and the store, he met with tribal officials and discussed the measures that the Tribe wanted taken.

Without taking those measures, however, appellee reopened the store in May 1979.

1. Among other allegations, tribal authorities asserted that the store posed a fire hazard and that food kept there was exposed to a risk of rodent contamination.

In June, the Tribe obtained an injunction in the tribal court directing appellee to close the store until he obtained a "certificate of occupancy" in accordance with the Tribal Code. Appellee refused, and tribal police forcibly closed the store. After four days, appellee obtained a temporary certificate of occupancy and reopened his store. He did not make the repairs and improvements the Tribe wanted, and in September 1979 the Tribe again sued in the tribal court to compel him to close the store.

Appellee then filed the instant action in federal district court, seeking to enjoin tribal officers from regulating the operation of his business. The Tribe agreed to defer action in the tribal court, with leave to reactivate that case upon notice to appellee. Such notice was given in February 1980, and appellee moved in the district court for a temporary restraining order blocking the Tribe's action. The Tribe postponed action in the tribal court until April 1980, when the tribal court granted a preliminary injunction against the operation of appellee's store.

The instant case was referred to a magistrate, who recommended that appellee's complaint be dismissed for want of federal-question jurisdiction. The district court, however, ruled that it did have jurisdiction, and enjoined the Tribe from enforcing its building, health, and safety regulations against appellee. This appeal followed.

## DISCUSSION

Appellants contend both that the district court was without jurisdiction to hear the instant case and that even if jurisdiction did exist, they should prevail on the merits. We reject their jurisdictional contention but agree with them as to the merits.

■ The district court correctly held that it had jurisdiction to hear this suit under 28 U.S.C. § 1331, which gives district courts jurisdiction over "civil actions arising under the Constitution, laws, or treaties of the United States." The crux of appellee's argument is that tribal regulation of his business runs afoul of the principles enunciated by the Supreme Court in *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978)—principles that are not drawn from any specific statute or treaty, but rather form a part of federal common law. Since this action thus arises under federal common law, it falls within the general federal-question jurisdiction conferred by § 1331. *Illinois v. City of Milwaukee*, 406 U.S. 91, 100, 92 S.Ct. 1385, 1391, 31 L.Ed.2d 712 (1972).[2]

On the merits, the district court rejected appellants' argument that the power to impose reasonable health and safety regulations on appellee's business was an inherent sovereign power retained by the Tribe. The district court based its decision largely on its reading of *Oliphant, supra,* stating: "[T]he Court finds, in light of *Oliphant,* that the tribe's power of self-government to regulate the internal and social relations of its members does not extend to non-Indian plaintiff." *Order Granting Injunctive Relief,* at 10.

■ *Oliphant* established that, absent specific authorization by Congress, Indian tribal courts have no criminal jurisdiction over non-Indians. But, as the Supreme Court noted, *Oliphant* concerned *only* the criminal jurisdiction of tribal courts. 435 U.S. at 196 n.7, 98 S.Ct. at 1014 n.7. The decision there rested partly on an examination of how the branches of the federal government, over the years, have viewed the prospect of Indian criminal jurisdiction over non-Indians, and partly on the Court's conclusion that such jurisdiction would impair the overriding federal interest in safeguarding the procedural rights of criminal defendants. Nothing in that reasoning suggests that Indian *civil* or *regulatory* juris-

---

**2.** This circuit's holding in *Trans-Canada Enterprises, Ltd. v. Muckleshoot Indian Tribe*, 634 F.2d 474 (9th Cir. 1980), does not compel a contrary conclusion. There the district court had enjoined enforcement of a tribal licensing ordinance against a non-Indian real estate developer. We reversed the district court, holding that it lacked subject matter jurisdiction. *Trans-Canada* differs decisively from the instant case, however, because the complaint there did not allege general federal-question jurisdiction. 634 F.2d at 476 n.4.

diction over non-Indians is inconsistent with Indians' dependent status—the test that *Oliphant* recognized for deciding which of their inherent sovereign powers Indian tribes have lost. 435 U.S. at 208, 98 S.Ct. at 1020–21.

To hold that Indian tribes cannot exercise civil jurisdiction over non-Indians would, when combined with *Oliphant*, eliminate altogether any tribal jurisdiction over persons not members of the tribe, and thus reduce to a nullity the Supreme Court's repeated assertions that Indian tribes retain attributes of sovereignty over their territory, not just their members.[3] Furthermore, tribal civil and regulatory jurisdiction over non-Indians has been explicitly approved in various contexts. In *Williams v. Lee*, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959), the Court held that tribal courts had exclusive jurisdiction over a civil suit by a non-Indian against reservation Indians arising out of a transaction on the reservation. In *Washington v. Confederated Tribes of the Colville Indian Reservation*, 447 U.S. 134, 152–54, 100 S.Ct. 2069, 2080–81, 65 L.Ed.2d 1172 (1980), reservation Indians were held to have the power to tax non-Indian purchasers of goods on the reservation. And a tribal severance tax on oil and gas extracted by non-Indians from leased reservation land was upheld in *Merrion v. Jicarilla Apache Tribe*, —— U.S. ——, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982).

■ The instant case does differ from those just cited in that here the Tribe seeks to regulate a non-Indian's activities on land which, though within the reservation's borders, is owned in fee by the non-Indian. As this circuit has observed, the Supreme Court's decision in *Montana v. United States*, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), established that the dependent status of Indian tribes has implicitly divested them of power to regulate, *in*

*general*, "the conduct of non-members on land no longer owned by, or held in trust for the Tribes." *Colville Confederated Tribe v. Walton*, 647 F.2d 42, 52 (9th Cir. 1981). Yet the *Montana* decision acknowledged that the tribes have retained the power to impose certain kinds of regulations on the activities of a non-member on fee lands within their reservations:

To be sure, Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands. A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements. A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.

*Montana, supra*, 450 U.S. at 565–66, 101 S.Ct. at 1258 (citations omitted). The Tribe's exercise of civil jurisdiction over appellee's business in the instant case belongs to *both* of the broad categories in which, according to *Montana*, Indian tribes retain their sovereign powers. First, the Tribe is regulating the activities of a nonmember, appellee, who has "enter[ed] consensual relationships with the [T]ribe ... through commercial dealing." Second, the conduct that the Tribe is regulating "threatens or has some direct effect on ... the health or welfare of the [T]ribe." Thus, the Tribe retains inherent sovereign power to impose its building, health, and safety regulations on appellee's business, notwithstanding appellee's ownership in fee of the land on which the store stands.[4]

**3.** *See Montana v. United States*, 450 U.S. 544, 563, 101 S.Ct. 1245, 1257, 67 L.Ed.2d 493 (1981); *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 142, 100 S.Ct. 2578, 2583, 65 L.Ed.2d 665 (1980); *United States v. Wheeler*, 435 U.S. 313, 323, 98 S.Ct. 1079, 1086, 55 L.Ed.2d 303 (1978); *United States v. Mazu-*

*rie*, 419 U.S. 544, 557, 95 S.Ct. 710, 718, 42 L.Ed.2d 706 (1975).

**4.** Appellee appears not to recognize the existence of inherent tribal sovereignty. He asserts on appeal that "Indian tribes completely surrendered up their sovereignty and became com-

■ In addition to reading *Oliphant* as precluding civil, as well as criminal, jurisdiction by Indians over non-Indians, the district court expressed the belief that "the exercise of general tribal power over non-Indians raises enormous constitutional problems" because it contradicts "[t]he constitutional principle central to our notion of political justice"—namely, "government by the consent of the governed." *Order Granting Injunctive Relief*, at 8. The Supreme Court, in upholding a tribe's right to tax non-Indian enterprises operating on the reservation, recently answered this concern: "Whatever place consent may have in contractual matters and in the creation of democratic governments, it has little if any role in measuring the validity of an exercise of legitimate sovereign authority." *Merrion v. Jicarilla Apache Tribe*, —— U.S. ——, ——, 102 S.Ct. 894, 906, 71 L.Ed.2d 21 (1982). Since, as explained above, the Tribe's regulation of appellee's business is "an exercise of legitimate sovereign authority," it cannot be overturned because of appellee's non-consent.[5]

For the foregoing reasons, we reverse the judgment of the district court and hold that the Tribe has the power to enforce its building, health, and safety regulations against appellee's business. REVERSED and REMANDED.

plete dependents upon the sovereign federal government," Appellee's Brief at 9, and that "[t]he total extent of the tribe's recognized governmental powers" must be traced, explicitly or implicitly, to the provisions of the treaty by which the federal government recognized the Tribe. *Id.* at 19. These assertions are incorrect. Indian tribes, which were originally fully sovereign, are now dependent on the United States, but nevertheless "still possess those aspects of sovereignty not withdrawn by treaty or statute, or by implication as a necessary result of their dependent status." *United States v. Wheeler*, 435 U.S. 313, 323, 98 S.Ct. 1079, 1086, 55 L.Ed.2d 303 (1978).

5. Appellee argues that the General Allotment Act of 1887, ch. 119, 24 Stat. 388, implies that non-Indian purchasers of allotted land cannot be subjected to tribal jurisdiction. He has failed to point to any support for this claim, and we reject it. Indeed, in 1905, during the heyday of the allotment policy, the Eighth Circuit held that an Indian tribe retained the power to tax non-Indians despite their acquisition of land and incorporation of towns and cities:

> Neither the United States, nor a state, nor any other sovereignty loses the power to govern the people within its borders by the existence of towns and cities therein endowed with the usual powers of municipalities, nor by the ownership nor occupancy of the land within its territorial jurisdiction by citizens or foreigners.... The theory that the consent of a government to ... the conveyance of the title to lots or lands within [its territory] to private individuals exempts ... the owners or occupants of such lots from the exercise of all its governmental powers, ..., is too unique and anomalous to invoke assent.

*Buster v. Wright*, 135 F. 947, 952 (8th Cir.), *appeal dismissed*, 203 U.S. 599, 27 S.Ct. 777, 51 L.Ed. 334 (1905). *Buster* is cited approvingly in *Merrion v. Jicarilla Apache Tribe*, —— U.S. ——, —— ——, 102 S.Ct. 894, 904–05, 71 L.Ed.2d 21 (1982).