905 F.2d 1311
 53 Empl. Prac. Dec. P 40,020, 59 USLW 2020
 FMC, Plaintiff-Appellee,
v.
SHOSHONE-BANNOCK TRIBES, et al., acting By and Through its
Tero Commission aka The Shoshone-Bannock Tribes Tribal
Employment Rights Commission and its individual
Commissioners, Arnold Appenay, Al Timsanico, Marvin Osborne
and R. Willis Dixey; Shoshone Bannock Tribal Court;
Honorable Charles H. Lonah; Honorable Robert Gonzales,
Defendants-Appellants.
 No. 89-35349.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 9, 1990.
Decided June 18, 1990.
 
 Jeanette Wolfley, General Counsel, Shoshone-Bannock Tribes, Fort Hall, Idaho, for defendants-appellants.
 Gary L. Cooper, Racine, Olson, Nye, Cooper & Budge, Pocatello, Idaho, for plaintiff-appellee.
 Melody L. McCoy, Boulder, Colo., for amicus, Native American Rights Fund.
 Appeal from the United States District Court for the District of Idaho.
 Before FARRIS, PREGERSON and BOOCHEVER, Circuit Judges.
 FARRIS, Circuit Judge:
 
 
 1
 This case presents the question of the extent of power Indian tribes have over non-Indians acting on fee land located within the confines of a reservation. The Shoshone-Bannock Tribes are attempting to enforce a Tribal Employment Rights Ordinance, which requires all employers working on the reservation to give mandatory preferences in hiring to Indians. FMC, a non-Indian business operating on fee land inside the Reservation, challenges the Tribes' power to enforce the ordinance. The district court held that the Tribes did not have jurisdiction over FMC, reversing the decision of the Tribal Appellate Court, which had upheld the Tribes' jurisdiction to enforce the regulation. We reverse the decision of the district court and affirm the decision of the Tribal Appellate Court.
 
 I.
 BACKGROUND
 
 2
 The Shoshone-Bannock Tribes are federally recognized tribes residing on the Fort Hall Reservation in southeastern Idaho. The reservation encompasses 870 square miles, of which 96 per cent is tribal land or is held in trust by the United States for the benefit of the Tribes or their members, and four per cent is fee land owned by individuals, including non-Indians. As on many reservations, unemployment is rampant among the Shoshone-Bannock and contributes to the concomitant problems of poverty, alcoholism, drug abuse, and economic dependency.
 
 
 3
 In order to combat the problem of unemployment, in 1980 the Tribal Business Council, the governing body of the Tribes, adopted a Tribal Employment Rights Ordinance, EMPT-80-54, July 22, 1980. The TERO required employers working on the Reservation to give preference in employment, contracting, and subcontracting to Indians. The Secretary of the Interior approved the Ordinance on October 14, 1980. The TERO applies to all employers within the Reservation, including those owned by non-Indians operating on fee land.
 
 
 4
 FMC is such an employer. This non-Indian owned company has a plant on fee land within the Reservation that manufactures elemental phosphorus. FMC is the largest employer on the Reservation, with 600 employees. FMC has other connections to the Reservation in addition to the location of its plant. The company currently gets all of the phosphate shale (one of the three primary raw materials required for production) from mining leases located within the Reservation. The phosphate shale constitutes approximately 90 percent of the minerals used at the facility. The shale leases are on lands owned by the Tribes or by individual Indians. FMC's leases are managed and operated by J.R. Simplot Company, whose operation of the mines is regulated by the TERO. The mining leases account for revenue to the Tribes and to individual members. All other materials used in production come from areas off-Reservation. The final product, elemental phosphate, is all shipped off-Reservation.
 
 
 5
 Upon notification of the passage of the TERO, FMC objected to the ordinance's application to its plant. After negotiations with the Tribes, FMC entered into an employment agreement based on the TERO in 1981 that resulted in a large increase in the number of Indian employees at FMC.
 
 
 6
 In late 1986, the Tribes became dissatisfied with FMC's compliance with the employment agreement. After attempts to negotiate an end to the alleged violations of the agreement failed, the Tribes filed civil charges in Tribal Court. FMC immediately challenged the Tribal Court's jurisdiction in federal district court and persuaded the district court to enjoin the Tribes from enforcing any orders against FMC until the Tribal Court had an opportunity to rule on the Tribes' jurisdiction over FMC. The Tribal Court then found that the Tribes had jurisdiction over FMC and held that the company had violated the TERO. The Tribal Appellate Court affirmed those rulings. When the parties could not reach agreement for compliance, the Tribal Appellate Court entered its own compliance plan, which required 75% of all new hires and 100% of all promotions to be awarded to qualified Indians, mandated that one-third of all internal training opportunities be awarded to local Indians, and levied an annual TERO fee of approximately $100,000 on FMC. FMC then returned to federal district court for a preliminary injunction, which it received. In April 1988, the district court reversed the Tribal Appellate Court. The Tribes now appeal.
 
 II.
 STANDARD OF REVIEW
 
 7
 We review the decision of the district court, involving mixed questions of fact and law, de novo. United States v. McConney, 728 F.2d 1195, 1204 (9th Cir.), cert. denied, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).
 
 
 8
 The standard of review of a tribal court decision regarding tribal jurisdiction is a question of first impression among the circuits. The district court applied an "independent review" standard. The Tribes and amicus argue for a more deferential standard of clearly erroneous or arbitrary and capricious on both factual and legal questions, while FMC argues for clearly erroneous on factual questions and de novo on federal legal questions. We hold that FMC's proposed standard of review is the correct one.
 
 
 9
 The leading case on the question of tribal court jurisdiction is National Farmers Union Ins. Cos. v. Crow Tribe of Indians, 471 U.S. 845, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985), which established that a federal court must initially "stay[ ] its hand until after the Tribal Court has had a full opportunity to determine its own jurisdiction and to rectify any errors it may have made." This exhaustion of tribal remedies
 
 
 10
 allow[s] a full record to be developed in the Tribal Court before either the merits or any question concerning appropriate relief is addressed.... [It also will] encourage tribal courts to explain to the parties the precise basis for accepting jurisdiction, and will provide other courts with the benefit of their expertise in such matters in the event of further judicial review.
 
 
 11
 Farmers Union, 471 U.S. at 856-57, 105 S.Ct. at 2454 (citations and footnotes omitted). The existence of this Indian exhaustion requirement and the Court's earlier admonition that tribal courts are competent law-applying bodies, see, e.g., Santa Clara Pueblo v. Martinez, 436 U.S. 49, 65-66, 98 S.Ct. 1670, 1680-81, 56 L.Ed.2d 106 (1978), demonstrate that federal courts must show some deference to a tribal court's determination of its own jurisdiction.
 
 
 12
 The Farmers Union Court contemplated that tribal courts would develop the factual record in order to serve the "orderly administration of justice in the federal court." Id. This indicates a deferential, clearly erroneous standard of review for factual questions. This standard accords with traditional judicial policy of respecting the factfinding ability of the court of first instance. See generally McConney, 728 F.2d at 1200-04 (noting that the central goal in setting standards of review is to favor the court in the stronger position to determine the correct answer efficiently).
 
 
 13
 As to legal questions, the Farmers Union Court stated that the fact that a tribal court reviews a question first is helpful because other courts might "benefit [from] their expertise." Farmers Union, 471 U.S. at 857, 105 S.Ct. at 2454. This indicates that federal courts have no obligation to follow that expertise, but need only be guided by it. Moreover, federal courts are the final arbiters of federal law, and the question of tribal court jurisdiction is a federal question. Id. at 852-53, 105 S.Ct. at 2451-52. Federal legal questions should therefore be reviewed de novo.
 
 III.
 TRIBAL JURISDICTION
 
 14
 The Tribal Appellate Court held that the Tribes had jurisdiction to enforce the TERO against FMC. The court based its decision on Montana v. United States, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), the leading case on tribal civil jurisdiction over non-Indians. The Montana Court stated:
 
 
 15
 [There are two circumstances in which] Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands. A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements. A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.
 
 
 16
 Montana, 450 U.S. at 565-66, 101 S.Ct. at 1258 (citations omitted). The Tribal Appellate Court found that both Montana circumstances were present here. The court held that there was a consensual relationship between the Tribes and FMC sufficient to support application of the TERO to FMC, and also that the Tribes' economic security and general welfare would suffer by not enforcing the TERO against FMC. We reach only the first Montana factor, as we hold that the Tribal Appellate Court's decision on this ground was correct, and therefore the district court erred in its reversal.
 
 
 17
 Montana's First Test: Consensual Relationships.
 
 
 18
 In order to allow tribal jurisdiction over non-Indians on fee land, Montana requires "consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." 450 U.S. at 565, 101 S.Ct. at 1258. FMC has certainly entered into consensual relationships with the Tribes in several instances. Most notable are the wide ranging mining leases and contracts FMC has for the supply of phosphate shale to its plant. FMC also explicitly recognized the Tribes' taxing power in one of its mining agreements. FMC agreed to royalty payments and had entered into an agreement with the Tribes relating specifically to the TERO's goal of increased Indian employment and training. There is also the underlying fact that its plant is within reservation boundaries, although, significantly, on fee and not on tribal land. In sum, FMC's presence on the reservation is substantial, both physically and in terms of the money involved.
 
 
 19
 The district court held and FMC argues on appeal that these connections between the company and the Tribes, although substantial, do not provide a sufficiently close "nexus" to employment to support the TERO. FMC cites Cardin v. De La Cruz, 671 F.2d 363 (9th Cir.), cert. denied, 459 U.S. 967, 103 S.Ct. 293, 74 L.Ed.2d 277 (1982), to support its argument that a direct linkage must exist between the regulation and the particular activity regulated. In Cardin, a non-Indian owner of a grocery store on fee land inside the reservation sought to enjoin the tribe from enforcing its health regulations against him. We held that the non-Indian had entered into "consensual relations" with the tribe "through commercial dealings": The owner invited tribe members to come into the store for his products and depended on them to support his business. Cardin contains no explicit requirement of a nexus.
 
 
 20
 The commercial relationships here are at least as substantial as in Cardin. FMC depends on leases with the Tribes or tribal members for a substantial percentage of its raw materials at this plant, it has signed numerous contracts with the Tribes, including one relating particularly to employment, and finally, the company employed some, though few, Indians at the plant even before the TERO applied. FMC actively engaged in commerce with the Tribes and so has subjected itself to the civil jurisdiction of the Tribes. See, e.g., Babbitt Ford, Inc. v. Navajo Indian Tribe, 710 F.2d 587 (9th Cir.1983) (car dealer subjected himself to tribal jurisdiction by conducting business with the tribe), cert. denied, 466 U.S. 926, 104 S.Ct. 1707, 80 L.Ed.2d 180 (1984).
 
 
 21
 FMC is of course correct that at some point the commercial relationship becomes so attenuated or stale that Montana's consensual relationship requirement would not be met. For example, in UNC Resources, Inc. v. Benally, 514 F.Supp. 358, 362 (D.N.M.1981), cited by FMC, none of the tribe's dealings with the company related directly to the plant in question, which was not even inside the reservation. See also United States v. Anderson, 736 F.2d 1358, 1364-65 (9th Cir.1984) (finding no consensual relationship). The relationship here, however, is close enough to support the regulation.
 
 CONCLUSION
 
 22
 We reverse the decision of the district court. The Tribes may subject FMC to regulation of employment at its plant on fee land within the Reservation. We remand to the Tribal Court to give FMC an opportunity to challenge the application of the TERO under the Indian Civil Rights Act, 25 U.S.C. Sec. 1302.