Mary Jane **WILSON**, Plaintiff,

v.

Thomas David **MARCHINGTON** and **Inland Empire Shows, Inc.**, Defendants.

No. CV–92–127–GF.

United States District Court, D. Montana, Great Falls Division.

Nov. 8, 1995.

---

Cameron Ferguson, Hartelius, Ferguson, Baker & Kazda, P.C., Great Falls, MT, for plaintiff.

William O. Bronson, James, Gray & McCafferty, P.C., Great Falls, MT, for defendants.

Joseph P. Mazurek, Office of the Montana Attorney General, Helena, MT, for amicus curiae State of Montana.

Maxon R. Davis, Paul R. Haffeman, Davis, Hatley, Haffeman & Tighe, P.C., Great Falls, MT, for amicus curiae Glacier Electric Cooperative, Inc.

## 1178

### MEMORANDUM AND ORDER

HATFIELD, Chief Judge.

### BACKGROUND

The above-entitled matter has its genesis in an automobile accident which occurred east of Browning, Montana, within the exterior boundaries of the Blackfeet Indian Reservation. Defendant Thomas David Marchington, an employee of defendant Inland Empire Shows, Inc. ("Inland Empire"), was travelling through the Blackfeet Indian Reservation on U.S. Highway 2 when his semi-tractor trailer collided with a vehicle driven by the plaintiff, Mary Jane Wilson.

Plaintiff, an enrolled member of the Blackfeet Indian Tribe, filed suit in the Blackfeet Tribal Court, seeking compensatory and punitive damages based upon the defendants' purported negligence. The defendants entered an appearance in Tribal Court, specifically reserving the right to contest all jurisdictional issues in federal court.[1] The matter was ultimately tried before the Blackfeet Tribal Court, with a jury finding the defendants liable for the accident, and awarding plaintiff damages of $246,100.00.

Thereafter, plaintiff instituted the above-entitled action, requesting this court to "recognize and register" the tribal court judgment. Defendants moved to dismiss plaintiff's complaint, asserting the underlying judgment was not a final judgment, given the pendency of an appeal in the tribal court system. On April 28, 1994, this court entered an order staying all proceedings in the present action, pending exhaustion of tribal court remedies.[2]

■ Presently before the court are the parties' cross motions for summary judgment, pursuant to Fed.R.Civ.P. 56. The issue dispositive of the parties' respective summary judgment motions is whether the Blackfeet Tribal Court was vested with subject matter jurisdiction to adjudicate the underlying negligence action. The question of whether an Indian Tribe retains the authority to compel a non-Indian to submit to the jurisdiction of a tribal court presents a question of federal law, properly determined by the federal courts; the final arbiters of federal law. *National Farmers Union Ins. Cos. v. Crow Tribe of Indians,* 471 U.S. 845, 852, 105 S.Ct. 2447, 2451-52, 85 L.Ed.2d 818 (1985).[3] Accordingly, the issue of whether the Blackfeet Tribal Court possessed subject matter jurisdiction over the activities of the non-Indian defendants is ripe for review before this court, in the exercise of its federal question jurisdiction under 28 U.S.C. § 1331.

### DISCUSSION

#### I.

Plaintiff urges this court to uphold the Blackfeet Tribal Court's assertion of jurisdiction over the underlying negligence action. In essence, plaintiff asks the court to hold the commission of a single tortious act within the Blackfeet Indian Reservation vests the Blackfeet Tribal Court with subject matter

1. The defendants are not members of the Blackfeet Indian Tribe, nor do they reside on the reservation. In addition, the defendants do not conduct any business within the boundaries of the Blackfeet Indian Reservation.

2. On August 19, 1993, the Blackfeet Tribal Court of Appeals affirmed the finding of liability on the part of the defendants, but remanded the matter for a new trial as to damages. Plaintiff and defendants appealed the decision to the newly created Blackfeet Supreme Court. On July 1, 1994, the Blackfeet Supreme Court entered its decision, reversing the Blackfeet Tribal Court of Appeals and reinstating the original judgment. With that decision, all avenues of potential relief in the tribal court system have been exhausted by the parties.

3. In *National Farmers Union,* the Supreme Court recognized the question of whether a tribal court has exceeded its jurisdiction must be answered by reference to federal law. 471 U.S. at 853, 105 S.Ct. at 2452. Consequently, the Court held that a federal court possesses jurisdiction under 28 U.S.C. § 1331 to determine whether a Tribal Court has exceeded the lawful limits of its jurisdiction. *Id.* Nonetheless, considerations of comity, predicated upon the well-recognized congressional policy of promoting tribal self-government and self-determination, compelled the Court in *National Farmers Union* to announce a rule of exhaustion, which requires tribal court remedies to be exhausted before the question of tribal jurisdiction is addressed by the federal courts. 471 U.S. at 856-57, 105 S.Ct. at 2453-54. In the case *sub judice,* the "exhaustion rule" has been satisfied in that the underlying claim has advanced through the trial and appellate courts of the Blackfeet Indian Tribe, and a final Judgment has been entered therein.

jurisdiction over the resultant civil litigation. Plaintiff's jurisdictional argument is predicated upon the assumption that an Indian tribe retains unfettered jurisdiction over all civil litigation arising within its reservation boundaries.

In this court's opinion, plaintiff's presumption regarding the Blackfeet Tribal Court's unqualified "territorial jurisdiction" is an overly broad interpretation of tribal sovereignty. Moreover, plaintiff's argument ignores the Supreme Court's decisions in *Montana v. United States*, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), and *South Dakota v. Bourland*, 508 U.S. 679, 113 S.Ct. 2309, 124 L.Ed.2d 606 (1993).

## II.

■ The United States Supreme Court has repeatedly recognized that tribal courts have inherent power to adjudicate civil disputes affecting the interests of Indians and non-Indians which are based upon events occurring on a reservation. *See, e.g., Montana v. United States*, 450 U.S. 544, 566, 101 S.Ct. 1245, 1258–59, 67 L.Ed.2d 493 (1981); *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 65, 98 S.Ct. 1670, 1680–81, 56 L.Ed.2d 106 (1978). This authority emanates from the fact the several Indian tribes, as sovereign entities, possess the necessary attributes of sovereignty over both their members and their territory. *United States v. Wheeler*, 435 U.S. 313, 323, 98 S.Ct. 1079, 1086, 55 L.Ed.2d 303 (1978).

■ The sovereignty enjoyed by Indian Tribes, however, is not absolute.[4] Rather, it is subject to limitation by specific treaty provisions, by statute at the will of Congress, or by portions of the federal Constitution found especially binding on the tribes. *See, United States v. Wheeler, supra*, 435 U.S. at 322–326, 98 S.Ct. at 1085–88; *Iowa Mutual Ins. Co. v. LaPlante*, 480 U.S. 9, 14, 107 S.Ct. 971, 975, 94 L.Ed.2d 10 (1987); *Babbitt Ford, Inc. v. Navajo Indian Tribe*, 710 F.2d 587, 591 (9th Cir.1983). In addition, a tribe's inherent sovereignty is divested to the extent it is inconsistent with the tribe's dependent status, that is, to the extent it involves a tribe's "external relations." *Brendale v. Confederated Yakima Nation*, 492 U.S. 408, 425–26, 109 S.Ct. 2994, 3005, 106 L.Ed.2d 343 (1989).

> The areas in which such implicit divestiture of sovereignty has been held to have occurred are those involving the relations between an Indian tribe and non-members of the tribe.... These limitations rest on the fact that the dependent status of Indian tribes within our territorial jurisdiction is necessarily inconsistent with their freedom independently to determine their external relations. But the powers of self-government, including the power to prescribe and enforce internal criminal laws, are of a different type. They involve only the relations among members of a tribe. Thus, they are not such powers as would necessarily be lost by virtue of a tribe's dependent status.

*United States v. Wheeler, supra*, 435 U.S. at 326, 98 S.Ct. at 1087.

A recurring issue involving Indian tribal sovereignty is to what extent the tribes retain inherent power to exercise civil jurisdiction over the activities of non-Indians on the reservation. The United States Supreme Court, in *Montana v. United States*, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493

---

**4.** A tribe's inherent sovereignty was originally considered coextensive with its territorial boundaries, necessarily including all reservation-based activities involving members of the tribe, non-Indians, or Indians who were not members of the tribe. *See, White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 151, 100 S.Ct. 2578, 2587, 65 L.Ed.2d 665 (1979) (stating that "there is a significant geographical component to tribal sovereignty"); *Williams v. Lee*, 358 U.S. 217, 223, 79 S.Ct. 269, 272 (1959). The presumption equating a tribe's inherent sovereignty with its reservation boundaries has been expressly rejected in the criminal context. *See, Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 208–12,

98 S.Ct. 1011, 1014, 55 L.Ed.2d 209 (1978) (criminal jurisdiction over non-Indians was not part of tribe's "retained inherent powers of government"). *See also, Duro v. Reina*, 495 U.S. 676, 687–88, 110 S.Ct. 2053, 2061, 109 L.Ed.2d 693 (1989) (tribe lacked criminal jurisdiction over a nonmember Indian with respect to on reservation conduct). In the civil context, the Supreme Court, in *Montana v. United States*, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), declined to recognize tribal authority to regulate hunting and fishing by all individuals within the external boundaries of the reservation, thereby implicitly rejecting a geographically-based view of tribal sovereignty.

(1981),[5] addressed the limitations on tribal sovereignty with respect to the assertion of civil jurisdiction over non-Indians. In *Montana*, the Court reiterated the general proposition that the inherent sovereign powers of an Indian Tribe do not extend to the activities of non-members of the tribe. 450 U.S. at 565, 101 S.Ct. at 1258. Recognizing the dependent status of the Tribes necessarily entails a divestiture of some attributes of sovereignty, the Court endeavored to delineate the extent to which the Indian Tribes retain their inherent sovereign power to exercise civil jurisdiction over the activities of non-Indians occurring within the reservation. The Court concluded:

> A tribe may regulate through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements. A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.

*Montana*, 450 U.S. at 565–566, 101 S.Ct. at 1258.

The analysis of civil tribal jurisdiction, as set forth in *Montana*, was reaffirmed by the Supreme Court in *South Dakota v. Bourland*, 508 U.S. 679, 113 S.Ct. 2309, 124 L.Ed.2d 606 (1993). In *Bourland*, the Court granted *certiorari* to determine whether the Cheyenne River Sioux Tribe could regulate non-Indian hunting and fishing on reservation lands conveyed by the tribe to the United States under the Cheyenne River Act, Pub.L. No. 83–776, 68 Stat. 1191 (1954), or acquired from non-members pursuant to the Flood Control Act of 1944, Pub.L. No. 78–534, 58 Stat. 887 (1944), for the purpose of constructing a dam and reservoir.

The Court, relying upon *Montana*, concluded that Congress, in taking the reservation lands at issue and opening the lands for public use, eliminated the tribe's power to exclude non-Indians from the lands and, as a result, abrogated the tribe's regulatory jurisdiction over non-Indian hunting and fishing on the taken lands. 508 U.S. at 697–99, 113 S.Ct. at 2320–21, 124 L.Ed.2d at 624–625.[6] The Court further determined the tribe's inherent sovereignty did not provide a basis for the regulation of non-Indian hunting and fishing, holding "the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe." *Bourland*, 508 U.S. at 695 n. 15, 113 S.Ct. at 2319 n. 15, 124 L.Ed.2d at 623 n. 15, *quoting*, *Montana*, 450 U.S. at 565. The Court reiterated that, "after *Montana*, tribal sovereignty over nonmembers 'cannot survive without express congressional delegation' ... and is therefore not inherent." 508 U.S. at 695 n. 15, 113 S.Ct. at 2320, 124 L.Ed.2d at 623 n. 15. The Court acknowledged the tribe could

**5.** In *Montana*, the Supreme Court considered whether the Crow Indian Tribe possessed the authority to regulate hunting and fishing by non-members on land owned by non-members, *i.e.*, private individuals or the State of Montana, within the reservation's exterior boundaries. The Court held the tribe could only regulate non-member hunting or fishing on land owned by the tribe or held by the United States in trust for the tribe. *Montana*, 450 U.S. at 564–65, 101 S.Ct. at 1257. In so holding, the court noted "the exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes and so cannot survive without express congressional delegation." *Id.* at 564, 101 S.Ct. at 1258. Accordingly, because the regulation of hunting and fishing by non-members on land no longer owned by Indians had no "clear relationship to tribal self-government or internal relations," the Court concluded the proposed regulation did not fall within the tribe's "retained inherent sovereignty." *Id.*

**6.** The Court analyzed, as it had in *Montana*, the issue of treaty-based regulatory authority separately from the issue of inherent tribal authority, and treated any treaty-based right to regulate non-Indian hunting and fishing as a "lesser-included" power of the more general authority to exclude non-Indians from reservation lands. 508 U.S. at 690–91, 113 S.Ct. at 2317, 124 L.Ed.2d at 620. The Court noted the loss of the right to exclude as a practical matter dictated the conclusion that the tribe's concomitant power to regulate was necessarily reduced because "the power to regulate is of diminished practical use if it does not include the power to exclude: regulatory authority goes hand in hand with the power to exclude." *Bourland*, 508 U.S. at 691 n. 11, 113 S.Ct. at 2317 n. 11, 124 L.Ed.2d at 620 n. 11.

invoke "other potential sources of tribal jurisdiction over non-Indians," namely, the two exceptions set forth in *Montana*[7], and remanded the matter for a determination as to whether the exceptions applied to the taken land. *Bourland*, 508 U.S. at 695, 113 S.Ct. at 2320, 124 L.Ed.2d at 623.

■ Subsequent to *Montana* and *Bourland*, any presumption equating a tribe's inherent sovereignty with its reservation boundaries is without merit. On the contrary, when an Indian tribe invokes its inherent sovereignty as the basis of its authority over non-Indians on non-Indian fee lands, there is a presumption against tribal authority. As the Court specifically noted in *Bourland*, "the exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes" and, as a result, tribal sovereignty over nonmembers "cannot survive without express congressional delegation." *Bourland*, 508 U.S. at 695, 113 S.Ct. at 2319, 124 L.Ed.2d at 623, *citing, Montana*, 450 U.S. at 564, 101 S.Ct. at 1258. Consequently, for a tribe to exercise jurisdiction over non-members, the *Montana* exceptions must be satisfied because the "inherent attributes of sovereignty" do not extend to non-members. *Bourland*, 508 U.S. at 695 n. 15, 113 S.Ct. at 2320 n. 15, 124 L.Ed.2d at 623 n. 15.

Accordingly, a tribe can only succeed in asserting inherent sovereignty over activities of non-Indians on land not owned by the Tribe (1) where Congress has expressly delegated such power to the tribe; (2) where the first *Montana* exception applies, under which the non-Indians have entered consensual relations with tribe or tribal members; or (3) where the second *Montana* exception applies, under which the activities of non-Indians threaten the political integrity, economic security, or health and welfare of the tribe.

### III.

■ In the case *sub judice*, plaintiff asserts the principles articulated in *Montana* are inapplicable to the present action because *Montana* focused upon a tribe's regulatory jurisdiction rather than adjudicatory jurisdiction. Plaintiff's argument ignores the fact that tribal adjudicatory jurisdiction, like tribal regulatory jurisdiction, emanates from a tribe's retained inherent authority. *American Indian Law Deskbook*, p. 131 (1993), *citing*, Dale, *Tribal Court Jurisdiction Over Reservation–Based Claims: The Long Walk to the Courthouse*, 66 Or.L.Rev. 753, 796–98 (1987). For example, in *National Farmers Union Insurance Companies v. Crow Tribe*, 471 U.S. 845, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985), the Court characterized the exercise of jurisdiction by a tribal court over a state school district as presenting another question "concerning the extent to which Indian tribes have retained the power to regulate the affairs of non-Indians." 471 U.S. at 851, 105 S.Ct. at 2451. "Implicit in that characterization was the notion that civil-adjudicatory authority of tribes is coextensive with their power to regulate the underlying transaction; i.e., the scope of tribal court subject matter jurisdiction is inextricably connected to the substantive issue of whether tribal law may determine the substantive rights and responsibilities of the litigants towards one another." *American Indian Law Deskbook, supra*, at p. 131.

Moreover, the *Montana* Court held, without qualification or caveat, that the exercise of tribal power may not, absent express congressional delegation, exceed that necessary to protect tribal self-government or to control internal relations. *Montana*, 450 U.S. at 564, 101 S.Ct. at 1257–58. The Court specifically identified those instances which would give rise to civil jurisdiction over non-Indians on their reservations. *Id.* at 565, 101 S.Ct. at 1258. The *Montana* Court's analysis of civil

---

7. The *Montana* court recognized the following narrowly prescribed exceptions to the implicit divestiture of the sovereign power of the Indian tribes to control the activities of non-members: (1) "a tribe may license or otherwise regulate activities of nonmembers who enter 'consensual relationships' with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements"; and (2) "a tribe may ... retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Montana*, 450 U.S. at 565–566, 101 S.Ct. at 1258.

tribal jurisdiction over non-Indians has been relied upon in subsequent decisions invoking a tribe's adjudicatory jurisdiction. *See, Stock West Corp. v. Taylor,* 964 F.2d 912, 918–19 (9th Cir.1992); *FMC v. Shoshone–Bannock Tribes,* 905 F.2d 1311, 1314 (9th Cir.1990); and *Sanders v. Robinson,* 864 F.2d 630, 632 (9th Cir.1988). Accordingly, plaintiff's attempt to dismiss *Montana* solely because it focused upon a tribe's regulatory jurisdiction is without merit.

## IV.

As stated previously, plaintiff's jurisdictional argument is based upon the assumption that jurisdiction over all civil litigation arising within the reservation boundaries presumptively lies with the tribal courts. Plaintiff predicates her notion of "tribal territorial jurisdiction" upon the Supreme Court's decisions in *National Farmers Union Insurance Companies v. Crow Tribe,* 471 U.S. 845, 856–57, 105 S.Ct. 2447, 2453–54, 85 L.Ed.2d 818 (1985); and *Iowa Mutual Ins. Co. v. LaPlante,* 480 U.S. 9, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987).

*National Farmers Union* involved a suit brought in Crow Tribal Court by Leroy Sage, a Crow Indian minor, against a Montana school district for injuries suffered when he was struck by a motorcycle on school grounds owned by the State of Montana within the boundaries of the Crow Indian Reservation. The Supreme Court expressly declined the opportunity to address tribal courts' civil jurisdiction over reservation-based causes of action involving Indian plain-

tiffs and non-Indian defendants. *National Farmers Union,* 471 U.S. at 854, 105 S.Ct. at 2452–53. Rather, the Court held the question of whether the tribe's retained sovereignty included the power to compel a non-Indian to submit to the jurisdiction of its courts must be answered by federal law, which may have divested the tribe of such power, and therefore was a federal question included within the jurisdiction of the federal district courts. *Id.* at 852–53, 105 S.Ct. at 2451–52. The Court did not, however, address the issue of whether the Crow Tribe had jurisdiction over the underlying tort claim. Rather, the Court left the issue for a separate inquiry, stating:

> [T]he existence and extent of a tribal court's jurisdiction will require a careful examination of tribal sovereignty, the extent to which that sovereignty has been altered, divested, or diminished, as well as a detailed study of relevant statutes, Executive Branch policy as embodied in treaties and elsewhere, and administrative or judicial decisions.

*Id.* at 855–56, 105 S.Ct. at 2453. That examination, the Court held, should be first conducted in the tribal court whose jurisdiction is being challenged. *Id.*[8]

In *Iowa Mutual,*[9] the Court, in reaffirming the exhaustion rule announced in *National Farmers Union,* stressed a tribe's authority over the activities of non-Indians on the reservation would be impaired by unconditional access to federal courts.

> In diversity cases, as well as federal question cases, unconditional access to the

---

8. The Court adopted this approach on the grounds that exhaustion of tribal remedies supports tribal self-government and self-determination; serves the "orderly administration of justice" in federal court by allowing the tribal court to develop a full record before either the merits of the case or the appropriate relief is addressed and to have a full opportunity to "determine its own jurisdiction and to rectify any errors it may have made"; encourages tribal courts to explain the basis for jurisdiction to the parties; and gives any later reviewing courts the benefit of tribal court expertise. *National Farmers Union,* 471 U.S. at 856–57, 105 S.Ct. at 2453–54. Accordingly, exhaustion of remedies in tribal court was required before a federal court could entertain a claim for relief from the tribal court's assertion of jurisdiction. *Id.* at 857, 105 S.Ct. at 2454.

9. *Iowa Mutual,* like *National Farmers Union,* arose from a tort which occurred upon an Indian reservation. Edward LaPlante, a member of the Blackfeet Indian Tribe, was injured while working on the Blackfeet Indian Reservation for a Montana corporation. LaPlante filed a complaint in tribal court against the corporation for personal injuries, and against Iowa Mutual, the corporation's insurer, for its bad faith refusal to settle his claim. Iowa Mutual brought suit in Montana federal district court, invoking the court's diversity jurisdiction under 28 U.S.C. § 1332, seeking a declaration that it did not have to defend or indemnify the corporation.

federal forum would place it in direct competition with the tribal courts, thereby impairing the latter's authority over reservation affairs.... Adjudication of such matters by any nontribal court also infringes upon tribal law-making authority, because tribal courts are best qualified to interpret and apply tribal law.

*Iowa Mutual,* 480 U.S. at 16, 107 S.Ct. at 976. The Court emphasized "[T]ribal authority over the activities of non-Indians on reservation lands is an important part of tribal sovereignty" and, as a result, "civil jurisdiction over such activities presumptively lies in the tribal courts unless affirmatively limited by a specific treaty provision or federal statute." *Id.* at 18, 107 S.Ct. at 977.

The Supreme Court's presumption of tribal court civil jurisdiction over non-Indian activities, as evidenced in *Iowa Mutual* and *National Farmers,* does reflect, in part, a geographically-based view of a tribe's adjudicatory jurisdiction. Nevertheless, close analysis of *National Farmers Union* and *Iowa Mutual* compels the court to reject plaintiff's jurisdictional argument.

If the Supreme Court had fully accepted a geographically based view of tribal court civil jurisdiction in *National Farmers* and *Iowa Mutual,* it could have expressly recognized tribal court civil jurisdiction as extending to all civil causes of action arising within the geographic boundaries of the reservation. In such a situation, there would be no role for federal court review; barring any voluntary tribal restrictions on tribal court jurisdiction, the only jurisdictional issue would be whether the cause of action actually arose on the reservation. Instead, the Court has allowed federal district court review of tribal court jurisdiction based on treaties, federal statutes and federal court decisions. *See, National Farmers,* 471 U.S. at 856, 105 S.Ct. at 2453–54.

In addition, *Iowa Mutual,* contrary to plaintiff's argument, simply held that exhaustion of tribal remedies is required before a federal district court can decide the issue of federal court jurisdiction. Moreover, the Court did not, in either *Iowa Mutual* or *National Farmers,* determine whether the Indian tribe had authority over the nonmembers involved. Rather, the court simply established an exhaustion rule and left open the possibility that the exercise of jurisdiction could be later challenged in federal court. *Brendale v. Confederated Yakima Indian Nation,* 492 U.S. 408, 427 n. 10, 109 S.Ct. 2994, 3006 n. 10, 106 L.Ed.2d 343 (1989), *citing, Iowa Mutual,* 480 U.S. at 16, 19, 107 S.Ct. at 976, 978; and *National Farmers,* 471 U.S. at 856–857, 105 S.Ct. at 2453–54.

Finally, if the court were to accept plaintiff's assertion that mere presence within reservation boundaries is sufficient to invoke tribal court jurisdiction, there would be no need to consider *Montana*'s threshold distinction between those reservation lands owned by Indians and those owned by non-Indians. *Swift Transportation, Inc. v. John,* 546 F.Supp. 1185, 1193 (D.Az.1982). In this court's opinion, *Montana* may not be disregarded so easily.

*Iowa Mutual* and *National Farmers* should not be read to expand the category of activities which *Montana* finds gives rise to tribal jurisdiction over non-Indians or non-members.[10] *A–1 Contractors v. Strate,* 1994 WL 666051, at *8 (8th Cir.1994) (Hansen, J., dissenting), *rehearing granted and opinion vacated,* (January 9, 1995).

The Supreme Court's observation in *Iowa Mutual* should be read within the parameters of the *Montana* decision. When the Court observes that "Tribal authority over the activities of non-Indians on Reservation lands is an important part of tribal

---

**10.** In so holding, the court is cognizant of the fact the Supreme Court, in *Duro v. Reina,* 495 U.S. 676, 110 S.Ct. 2053, 109 L.Ed.2d 693 (1989), expressly recognized that a tribe's inherent power is somewhat broader in the civil context, holding "the retained sovereignty of the tribes is that needed to control their own internal relations and to preserve their own unique customs and social order." 495 U.S. at 688, 110

S.Ct. at 2061. Nevertheless, the Court emphasized "civil authority typically involves situations arising from property ownership within the reservation or 'consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements.'" *Id.* at 688, 110 S.Ct. at 2061, *quoting, Montana, supra,* 450 U.S. at 565, 101 S.Ct. at 1258.

sovereignty," the Court is referring to the type of activities, such as consensual contractual relationships, that give rise to tribal authority under *Montana*. Likewise, when the Court goes on to say "civil jurisdiction over such activities presumptively lies in the tribal courts unless affirmatively limited by a specific treaty provision or federal statute," the Court is again referring to the civil jurisdiction the Tribe possesses over non-Indians by virtue of the non-Indians' activities which give rise to tribal jurisdiction under *Montana*.

*Id.* at *9.

*A–1 Contractors* arose from a motor vehicle accident on the Fort Berthold Indian Reservation involving two non-members of the tribe. A divided panel of the Eighth Circuit Court of Appeals, relying upon *Iowa Mutual*, held subject matter jurisdiction over the underlying personal injury action vested in the tribal court. *Id.* at *5. In so holding, the court concluded *Montana*'s general divestiture of tribal civil jurisdiction over the activities of non-Indians was limited to fee lands owned by non-Indians. *Id.* at *4. In the alternative, the majority concluded the tribe retained the inherent sovereign authority to exercise civil jurisdiction under both *Montana* exceptions.

The dissent took issue with the majority's narrow reading of *Montana*, arguing the Supreme Court had not limited its discussion or rationale to jurisdictional issues arising on fee lands. *Id.* at *7. Accordingly, the dissent maintained the presumptive jurisdiction alluded to in *Iowa Mutual* arises only after one of the *Montana* exceptions is found applicable. *Id.* at *8. The dissent concluded *Montana*'s requirement that a tribal interest be involved before a tribal court may assert jurisdiction was dispositive and precluded a finding of tribal court jurisdiction.

In adopting what amounts to a concept of "tribal territorial jurisdiction," the majority is exalting the situs of the event above the tribal interest requirement set forth in *Montana*. Simply stated, this case is not about the tribe's ability to govern itself; it is about the tribe's claimed ability to govern others who are non-Indians and nonmembers of the tribe just because they enter the tribe's territory. By remaining within the principled approach of *Montana*, the tribe's ability to govern itself is inherently maintained because the tribal court will have jurisdiction any time a "tribal interest" in a dispute is established. Under *Iowa Mutual*, where such a tribal interest exists, the jurisdiction is broad and requires an affirmative change in federal law to limit it in any way. However, because I find that the majority incorrectly applies the relevant authority and because there is no tribal interest involved in this case, I respectfully dissent from the court's decision finding civil tribal jurisdiction over this dispute.

*A–1 Contractors*, at *10.

■ This court finds the dissenting opinion in *A–1 Contractors* to be well reasoned and hereby adopts the same.[11] Accordingly, the court adopts the following test set forth therein, which the court finds well reasoned and a logical reading of *Montana* and *Iowa Mutual:* "[A] valid tribal interest must be at issue before a tribal court may exercise civil jurisdiction over a non-Indian or nonmember, but once the tribal interest is established, a presumption arises that tribal courts have jurisdiction over the non-Indian or nonmember unless that jurisdiction is affirmatively limited by federal law." *A–1 Contractors*, at *9, *citing*, Felix S. Cohen, *Handbook of Federal Indian Law*, p. 342–43 (1982 ed.) ("Tribal courts probably lack jurisdiction over civil cases involving only non-Indians in most situations, since it would be difficult to establish any direct impact on Indians or their property.").

## V.

■ In the case *sub judice*, the underlying accident occurred on U.S. Highway 2, which is located on a right-of-way granted to the State of Montana pursuant to section 4 of the Act of March 3, 1901, codified at 25 U.S.C.

---

**11.** The court finds it important to note that the majority decision was subsequently vacated and the matter is currently awaiting rehearing.

§ 311.[12] It is beyond dispute that designating a right of way as a U.S. Highway, with the concomitant unrestricted access to the general public, abrogated any pre-existing right to regulatory control by the Blackfeet Tribe. *See, Swift Transportation, supra,* 546 F.Supp. at 1192. *See also, Bourland, supra,* 508 U.S. at 691, 113 S.Ct. at 2317, 124 L.Ed.2d at 620 ("abrogated treaty right of unimpeded use and occupation of lands 'can no longer serve as the basis for tribal exercise of the lesser-included power' to exclude."). Consequently, U.S. Highway 2 is, in effect, the "equivalent ... of the non-Indian fee land in *Montana.*" *Swift, supra,* 546 F.Supp. at 1192. *See also, Bourland,* 508 U.S. at 692, 113 S.Ct. at 2318, 124 L.Ed.2d at 621 ("regardless of whether land is conveyed pursuant to an Act of Congress for homesteading or for flood control purposes, when Congress has broadly opened up such land to non-Indians, the effect of the transfer is the destruction of pre-existing Indian rights to regulatory control").

■ Accordingly, the issue becomes whether either *Montana* exception gives rise to a "tribal interest" sufficient to confer the Blackfeet Tribal Court with adjudicatory jurisdiction over the underlying action. It is beyond dispute that resolution of plaintiff's personal injury claims does not involve a dispute arising under the terms of, or out of, or within the ambit of any "consensual agreement" between the Tribe and the defendants.

As a result, the first *Montana* exception is inapplicable.

The second *Montana* exception is equally inapplicable. Plaintiff's claims do not bear any relationship to tribal self-government or internal relations, nor do they threaten "the political integrity, the economic security or the health or welfare of the tribe." *See, Montana,* 450 U.S. at 565–66, 101 S.Ct. at 1258. Regardless of the accident's undisputed impact on the plaintiff, the focus in resolving the jurisdictional issue must, of necessity, be on the interests of the tribe rather than the individual tribal member. *Swift Transportation, supra,* 546 F.Supp. at 1193. "Limiting tribal court jurisdiction over non-Indians to cases involving a direct effect on the tribe itself is also consistent with *Montana*'s 'general proposition' that tribal powers do not extend to nonmembers." *Id., citing, Montana,* 450 U.S. at 565, 101 S.Ct. at 1258.

Given the absence of any "consensual relationship" between the defendants and the Blackfeet Tribe, and the fact that the accident had no "direct effect" on the tribe, the present action falls squarely within *Montana*'s general rule that tribes have been divested of jurisdiction over non-Indians as a result of their dependent status. There is no tribal interest at issue justifying tribal court jurisdiction over the underlying action. To hold otherwise would exalt the situs of the event, *i.e.,* the automobile accident, above the tribal interest requirement set forth in *Montana.*[13]

12. Section 311 provides:
> The Secretary of the Interior is authorized to grant permission, ... to the proper State or local authorities for the opening and establishment of public highways, in accordance with the laws of the State or Territory in which the lands are situated, through any Indian reservation or through any lands which have been allotted in severalty to any individual Indian under any laws or treaties but which have not been conveyed to the allottee with full power of alienation.

25 U.S.C. § 311.

13. An additional policy consideration supports the court's conclusion. The Supreme Court, in *Duro v. Reina,* 495 U.S. 676, 687–88, 110 S.Ct. 2053, 2060–61, 109 L.Ed.2d 693 (1989), held a tribe lacked criminal jurisdiction over a nonmember Indian with respect to on reservation conduct. In so holding, the Court noted the basis for limiting a tribe's authority over non-members is "the voluntary character of tribal membership and the concomitant right of participation in tribal government," together with a corresponding hesitancy to extend "tribal authority over those who have not given the consent of the governed that provides a fundamental basis for power within our constitutional system." *Duro,* 495 U.S. at 694, 110 S.Ct. at 2064. Specifically, the Court noted the nonmember Indian stands in the same relation to the tribe as a non-Indian does: Neither is eligible to become a member of the tribe; and as nonmembers, neither can serve on tribal juries, hold tribal office, or vote in tribal elections. *Id.* at 688, 110 S.Ct. at 2061. The Court further noted the fact that tribal courts do not contain the same personal liberty guarantees as state and federal courts, *e.g.,* the Bill of Rights does not directly apply to proceedings in tribal courts, although the Indian Civil Rights Act, 25 U.S.C. 1301 § *et seq.,* does mandate some procedural protections. *Id.* at

**1186**

## VI.

Having set forth its analysis of the jurisdictional issue presented, the court, cognizant of the limitations imposed by the doctrine of *stare decisis*, must attempt to reconcile its conclusion with the Ninth Circuit Court of Appeals' recent decision in *Hinshaw v. Mahler*, 42 F.3d 1178 (9th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 485, 130 L.Ed.2d 398 (1994).

In *Hinshaw*, Kenneth and Gloria Mahler instituted an action against Lynette Hinshaw in the Tribal Court of the Confederated Salish and Kootenai Tribes of the Flathead Indian Reservation, seeking damages [14] resulting from the death of their son, Christian Mahler, who was killed in a traffic accident within the exterior boundaries of the reservation.[15] The tribal court denied Hinshaw's motion to dismiss for lack of subject matter jurisdiction, and the Tribal Appellate Court affirmed the decision. Thereafter, Hinshaw instituted an action in the United States District Court for the District of Montana, the Honorable Charles C. Lovell presiding, requesting the court to review the issue of tribal court jurisdiction.

The district court ultimately determined the tribal court properly exercised personal jurisdiction over Hinshaw and subject matter jurisdiction over the Mahlers' claims. The Ninth Circuit Court of Appeals, in a cursory, one-page discussion, affirmed the district court's decision pertaining to tribal court's subject matter jurisdiction. The court began its brief discussion with the observation that "[C]learly, the Tribes have not surrendered their authority to exercise jurisdiction over civil actions involving non-members." *Hinshaw*, 42 F.3d at 1180, *citing*, *Montana v. United States*, 450 U.S. 544, 565–66, 101 S.Ct. 1245, 1258–59, 67 L.Ed.2d 493 (1981); and *National Farmers Union Ins. Co. v. Crow Tribe*, 471 U.S. 845, 855–56, 105 S.Ct. 2447, 2453–54, 85 L.Ed.2d 818 (1985). The court went on to note:

> The Mahlers' action falls squarely within the scope of Tribal Ordinance 36–B.[16] Tribal Law and Order Code, Chapter II, § 1(2) (1985). The accident occurred within the boundaries of the Reservation. Glo-

---

693, 110 S.Ct. at 2063. However, tribal court actions in violation of the Indian Civil Rights Act are not subject to review in the federal courts unless the petitioner is being held in tribal custody. *See, Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 69–70, 72, 98 S.Ct. 1670, 1682–83, 1684, 56 L.Ed.2d 106 (1978); Cohen, *Handbook of Federal Indian Law*, p. 668 (federal court review under the Indian Civil Rights Act is limited to entertaining petitions for writs of habeas corpus).

The policy reasons cited by the *Duro* Court are equally applicable in the civil context with respect to defendants Inland Empire and Thomas David Marchington. To subject these defendants, whose only ties to the Blackfeet Indian Reservation stemmed from travelling on a U.S. Highway across the reservation, to the jurisdiction of the tribal court, with the attendant loss of the Constitutional rights afforded them under the Bill of Rights and the absence of any meaningful review in the federal courts, would be unjust, given the absence of any valid "tribal interest."

**14.** The Mahlers' complaint advanced two distinct claims for relief: (1) a wrongful death claim on their own behalf; and (2) a survivorship claim brought in their representative capacity as the personal representatives of their son's estate.

**15.** Christian Mahler was not an enrolled member of the Confederated Salish and Kootenai Tribes, although he resided within the boundaries of the Flathead Reservation with his parents. Gloria Mahler was an enrolled member of the Confederated Tribes. Lynette Hinshaw was not an enrolled member of the Tribes, but did reside within the boundaries of the reservation at the time of the accident.

**16.** Tribal Ordinance 36–B provides:

2. (a) To the fullest extent possible not inconsistent with federal law, the Tribes may exercise their civil regulatory and adjudicatory powers. To the fullest extent possible not inconsistent with federal law, the Tribal Court may exercise subject matter and personal jurisdiction. The jurisdiction over all persons of the Tribal Court may extend to and include, but not by way of limitation, the following:
(1) All persons found within the Reservation.
(2) All persons subject to the jurisdiction of the Tribal Court and involved directly or indirectly in:
(i) The transaction of any business within the Reservation;
(ii) The ownership, use or possession of any property, or interest therein, situated with the Reservation;
(iii) The entering into any type of contract within the Reservation or wherein any aspect of any contract is performed within the Reservation;
(iv) The injury or damage to property of the Tribes or a Tribal member.

ria Mahler, Kenneth Mahler, and Hinshaw reside on the Reservation and thus are 'found' on the Reservation, pursuant to section 1(2)(a)(1) & (2)(b). Hinshaw owned, used and possessed a motor vehicle within the Reservation, pursuant to section 1(2)(a)(2)(ii). Finally, Hinshaw's actions injured Gloria Mahler, a tribal member, pursuant to section 1(2)(a)(2)(iv).

The distinguishing feature in *Hinshaw*, as ascertained from the opinions therein, is that the tortfeasor was a non-member of the tribe, residing within the boundaries of the reservation at the time of the accident. However, neither the district court or the appellate opinion describes in any detail the extent of Hinshaw's contacts with the reservation, *e.g.*, whether she owned property within the reservation boundaries. In light of *Montana* and its progeny, as discussed previously, the court must infer a finding was made by the appellate court that Hinshaw's contacts with the Flathead Indian Reservation created the requisite "tribal interest" under the *Montana* exceptions, *i.e.*, (1) that Hinshaw possessed sufficient contacts with the reservation to create an ongoing "consensual relationship" with the tribe justifying tribal court jurisdiction; or (2) that failure to assert jurisdiction would threaten the political integrity, economic security, or health and welfare of the tribe. To hold otherwise would require turning a blind eye towards the development of tribal sovereignty as articulated by the Supreme Court.

The court, constrained by the doctrine of *stare decisis,* is bound to follow the holding of *Hinshaw*, despite the court's misgivings regarding the reasoning employed therein and the result dictated in the present action. Consequently, the court is compelled to conclude the Blackfeet Tribal Court was vested with jurisdiction to adjudicate the underlying action.

### CONCLUSION

For the reasons set forth above, the court concludes the summary judgment motion on behalf of the plaintiff is hereby GRANTED.

IT IS SO ORDERED.