McKAY, Circuit Judge.
Plaintiff-Appellant is a non-Indian New Mexico corporation operating several businesses-including a hotel, restaurant, cafeteria, gallery, curio shop, retail store, and RV park-on property held in fee simple but completely surrounded by Navajo Nation Reservation trust lands. This case involves Appellant’s challenge to a Hotel Occupancy Tax enacted by the Navajo Nation, Navajo Nation Code tit. 24, §§ 101— 142 (1995), requiring persons (Appellant’s guests in this case) to pay an eight percent tax on any room or space costing two dollars or more each day in a hotel which is located within the exterior boundaries of the Navajo Nation.[1] Id. at §§ 102-103. Appellant initiated its complaint against the tribe in 1993 in a declaratory judgment action brought in the United States District Court for the District of New Mexico. See Atkinson Trading Co. v. Navajo Nation, 866 F.Supp. 506, 507 (D.N.M.1994). The court in that case dismissed the action without prejudice requiring that Appellant exhaust its remedies in the tribal system. See id. at 512-13. After receiving an adverse result in the Navajo tribal system,[2] *1250 Appellant again brought a declaratory judgment action in the district court requesting a ruling that the Navajo Nation has no jurisdiction to impose its Hotel Occupancy Tax on Appellant’s guests. See Atkinson Trading Co. v. Gorman et al., No. 97-1261 BB/LFG (D.N.M. Aug. 21, 1998); R., Vol. Ill at 913. Appellant moved for trial de novo and summary judgment. The district court denied Appellant’s motions and granted instead Appellees’ cross-motion for summary judgment. See id. Appellant now appeals the district court’s rulings. We exercise jurisdiction under 28 U.S.C. § 1291.
I.
As a preliminary matter, we consider the district court’s denial of Appellant’s motion for trial de novo. Appellant argues that it should have received a new trial in the district court because the factual findings established in Appellant’s appeal to the Navajo tribal system were not supported by the evidence and because the Navajo Supreme Court demonstrated bias in its proceedings. The standard of review for a district court’s refusal to grant a new trial is abuse of discretion. See Unit Drilling Co. v. Enron Oil & Gas Co., 108 F.3d 1186, 1193 (10th Cir.1997).
The district court applied the standard set forth in Mustang Production Co. v. Harrison, 94 F.3d 1382, 1384 (10th Cir.1996), to Appellant’s declaratory judgment action. In Mustang, we adopted the reasoning of the Ninth Circuit from FMC v. Shoshone-Bannock Tribes, 905 F.2d 1311, 1313-14 (9th Cir.1990), and held that “when reviewing tribal court decisions on jurisdictional issues, district courts should review tribal courts’ findings of fact for clear error and conclusions of law de novo.” Mustang, 94 F.3d at 1384. Appellant complains that our holding was too deferential to decisions of tribal courts and argues that Mustang is no longer good law in light of the Supreme Court’s decision in Strate v. A-1 Contractors, 520 U.S. 438, 117 S.Ct. 1404, 137 L.Ed.2d 661 (1997). See Appellant’s Br. at 36. Appellant asserts that Strate overruled the reasoning of National Farmers Union Ins. Cos. v. Crow Tribe of Indians, 471 U.S. 845, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985), and, by implication, the reasoning of Mustang and FMC. See Appellant’s Br. at 36.
Strate, however, reiterated the holding of National Farmers Union and specifically upheld its reasoning. In National Farmers Union, a Montana school district and its insurer brought an action in federal district court challenging a tribal court’s assertion of jurisdiction over a personal injury action initiated against the school district on behalf of an Indian minor. The Supreme Court ruled that federal courts have the authority to determine whether a tribal court has exceeded the limits of its jurisdiction, National Farmers Union, 471 U.S. at 853, 105 S.Ct. 2447, but the Court instructed federal courts to follow a deferential exhaustion rule that gives examination of the jurisdictional question in the first instance to the tribal court. Id. at 856-57, 105 S.Ct. 2447. The National Farmers Union exhaustion rule allows a party to challenge in federal court a tribal court’s assertion of jurisdiction only after that party has exhausted the remedies available in the tribal court system. The Supreme Court explained the policy behind the rule: “Our cases have often recognized that Congress is committed to a policy of supporting tribal self-government and self-determination. That policy favors a rule that will provide the forum whose jurisdiction is being challenged the first opportunity to evaluate the factual and legal bases for the challenge.” Id. at 856, 105 S.Ct. 2447 (footnotes omitted). The Court reasoned that the rule would encourage tribal courts to explain “the precise basis for accepting jurisdiction” and “provide other courts with the benefit of *1251 their expertise ... in the event of further judicial review.” Id. at 857, 105 S.Ct. 2447. The exhaustion rule would also promote “the orderly administration of justice ... [that] will be served by allowing a full record to be developed in the Tribal Court” and would minimize the risks of a “procedural nightmare” like the one then before the Court. Id. at 856, 105 S.Ct. 2447.[3] Referring to policy considerations like these, our circuit adopted the Mustang standard of review for decisions of tribal courts. We find nothing in Strate to persuade us that the Supreme Court has changed the exhaustion rule or abandoned the reasoning behind it. We therefore conclude that we need not reexamine our decision in Mustang.
At issue in Strate was “the adjudicatory authority of tribal courts over personal injury actions against defendants who are not tribal members.” Strate, 520 U.S. at 442, 117 S.Ct. 1404. The petitioners in Strate wanted the Court to distinguish Montana v. United States, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), and extend the holding of National Farmers Union to establish a sweeping boundless form of tribal jurisdiction over disputes involving nonmembers. See Strate, 520 U.S. at 447, 117 S.Ct. 1404. The Court declined to extend National Farmers Union, concluding instead that National Farmers Union and Montana were completely compatible. See id. at 448, 117 S.Ct. 1404. Montana, the Court explained, addressed the larger “concept of ‘inherent sovereignty’ ” and the bounds of tribal power which were at issue in Strate. Id. at 453, 117 S.Ct. 1404 (quoting Montana, 450 U.S. at 563, 101 S.Ct. 1245). The National Farmers Union decision and its deferential rule did “not expand or stand apart from Montana’s instruction on ‘the inherent sovereign powers of an Indian tribe.’ ” Id. (quoting Montana, 450 U.S. at 565, 101 S.Ct. 1245). The Strate Court set forth a general proposition that was “unremarkable” for the purposes of its holding but is actually central to the discussion at hand, that is, “where tribes possess authority to regulate the activities of nonmembers, ‘[c]ivil jurisdiction over [disputes arising out of] such activities presumptively lies in the tribal courts.’ ” Id. at 453, 117 S.Ct. 1404 (quoting Iowa Mut. Ins. Co. v. LaPlante, 480 U.S. 9, 18, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987)) (alterations in original). Deference lies at the heart of the standard of review established in Mustang. Even the Strate Court recognized the deference that federal courts owe tribal courts. Significantly, Strate left intact the deferential reasoning of National Farmers Union and, by implication, the rationale of FMC and Mustang.
FMC and Mustang set forth a clearly erroneous standard of review for factual questions decided by the tribal courts. That standard is built upon the “traditional judicial policy of respecting the factfinding ability of the court of first instance,” FMC, 905 F.2d at 1313, a policy with theoretical underpinnings similar to those articulated by the Supreme Court in National Farmers Union. See, e.g., National Farmers Union, 471 U.S. at 856, 105 S.Ct. 2447 (“[T]he orderly administration of justice in the federal court will be served by allowing a full record to be developed in the Tribal Court before either the merits or any question concerning appropriate relief is addressed.”). The standard of review set forth in FMC and Mustang is de novo for questions of law decided in the tribal system. On that point, the FMC and Mustang courts expected that tribal courts would provide others “with the benefit of their expertise ... in the event of further judicial review.” National Farmers Union, 471 U.S. at 857, 105 S.Ct. 2447; see also FMC, 905 F.2d at 1313-14. This standard “indicates that federal courts have no obligation to follow [the tribal courts’] expertise, but need only be guided *1252 by it.” FMC, 905 F.2d at 1314. The rationale underlying the FMC and Mustang standards of review for factual and legal questions decided by the tribal courts still persuades us. We conclude that Mustang is still good law and that the district court in this case did not err in applying the Mustang standard to the decisions of the Navajo Supreme Court and Navajo Tax Commission.
Appellant asserts that even if the Mustang standard is still good law the district court erred in its application of that standard because it did not apply the Mustang exception for unfair and biased Indian tribunals.[4] Appellant argues in particular that the district court should have reviewed the factual findings of the Navajo Supreme Court de novo because the statements and findings expressed by the tribal court illustrate the pervasive bias Appellant faced in the Navajo Nation’s tribunal system. Appellant’s Br. at 39^43. Appellant is primarily concerned with: (1) the Navajo Supreme Court’s use of the term “lure” to suggest that Appellant improperly used “Navajo trappings” to attract tourists; (2) the court’s unnecessary criticism of the congressional policy behind the General Allotment Act of 1887; and (3) the court’s unfounded speculation as to why Appellant ceased hiring Navajos and buying wares from Navajo artisans shortly after it commenced this challenge to the Hotel Occupancy Tax. See R., Vol. II at 681-82, 684-85, 699. The district court treated these portions of the opinion as merely erroneous statements of the evidence-ignorable, refutable, and irrelevant as to whether the Hotel Occupancy Tax can be imposed upon Appellant’s non-Indian customers.[5] See R., Vol. Ill at 915. ■The district court concluded that “even accepting [Appellant’s] contention that the [Navajo Supreme Court’s] opinion makes some erroneous statements of fact that are not supported by the evidence,” it “does not come close to exhibiting the type of bias that would justify applying a different standard of review to the tribal court’s decision.” Id. at 916-17. Further, the district court noted that Appellant did not “contest ány of the essential facts found by the [Navajo Tax Commission] and relied on by the [Navajo] Supreme Court” and determined there was “no need for a de novo trial that would afford [Appellant] a second opportunity to contradict facts that it did not contest in the first proceeding.” Id. at 916. Based on our review of the record, including the opinion of the Navajo Supreme Court, we cannot say that the district court abused its discretion in failing to apply the Mustang exception for unfair and biased Indian tribunals and in denying Appellant’s motion for a new trial.
II.
We turn now to Appellant’s primary contention-that the district court erred in granting Appellee’s motion for summary judgment.[6] “We review the grant or denial of summary judgment de novo, applying the same standards as the district court.” Habermehl v. Potter, 153 F.3d 1137, 1138 (10th Cir.1998).
The district court ruled that the tribe’s authority to impose the tax on Appellant’s hotel guests who were not tribal members *1253 arose from the guests’ consensual relationship with the tribe.[7] The consensual relationship basis for tribal jurisdiction is an exception to a general rule limiting tribal jurisdiction over nonmembers; both the rule and the exception are detailed in Montana, 450 U.S. at 564-66, 101 S.Ct. 1245. In reaching its decision, the district court determined: (1) that the hotel guests staying at Appellant’s hotel had entered into a consensual relationship with the tribe; (2) the relationship entered into was relevantly related to the tax in question; and (3) the tax was not a disproportionate burden on Appellant’s guests. Appellant argues that it is Montana’s rule that must apply and not its exception and that the district court erred in “creatpng] a test that is different from that set forth in Montana and Strate.” Appellant’s Br. at 8. Because the primary dispute is whether the standard applied in this case is consistent with that set forth in Montana and Strate, we turn to this issue first.
A.
In Montana, the Supreme Court addressed the extent to which a tribe could exercise civil authority over non-Indians on lands owned in fee by non-Indians but located within the bounds of the tribe’s reservation. See Montana, 450 U.S. at 547, 101 S.Ct. 1245. The Court in that case held that the tribe could not prohibit non-Indians from hunting or fishing on fee lands within its reservation because “the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe.” Id. at 565, 101 S.Ct. 1245. Continuing with its holding, however, the Montana Court noted, “To be sure, Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands.” Id. The Court then set out two exceptions in which a tribe could exercise jurisdiction over non-Indians on its reservation. The first exception articulated by the Court permits a tribe to “regulate, through taxation, licensing, or " other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements.” Id. The second exception allows tribes to exercise inherent sovereign power over the conduct of non-Indians on their reservations when that conduct “threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.” Id. at 566, 101 S.Ct. 1245. In Strate, the Supreme Court applied the Montana rule of inherent sovereignty and held that a tribal court could not entertain a claim between nonmembers arising out of an accident occurring on a public highway that ran through reservation land because the petitioners failed to show their claim qualified under one of Montana’s two exceptions. Strate, 520 U.S. at 456-59, 117 S.Ct. 1404. Strate recognized both the Montana rule and its exceptions, and it is the latest example illustrating that a proper Montana analysis includes a discussion of whether one of the exceptions applies.
It is significant that we review the Montana standard in its entirety as we begin our disposition of this case. Importantly, a full understanding of the application of Montana’s exceptions requires special emphasis of the Court’s own phrase that “Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands.” Montana, 450 U.S. at 565, 101 S.Ct. 1245 (emphasis added). This phrase confirms that tribes may exercise their powers over nonmembers on non-Indian fee lands and clearly undermines the argument that the tribe lacks jurisdiction over Appellant’s nonmember guests because Appellant’s hotel is situated on fee land within the reser *1254 vation. The explicit caveat for tribal jurisdiction over nonmembers even on non-Indian fee lands demonstrates that the Supreme Court did not intend that fee status should become the determining factor in eases involving the assertions of tribal sovereign power over nonmembers on the reservation.
The district court in the case at hand observed that “[i]n both Montana and Strate, the Supreme Court mentioned the tribes’ right to tax certain activities as a matter of inherent sovereign power” but “limit[ed] this power by imposing conditions on it.” R., Vol. Ill at 924. Because the Supreme Court had consistently included taxation in its discussion of the consensual relationship exception to the Montana rule, the district court determined to analyze the Navajo tribe’s taxing authority under that exception.[8] In its application of the consensual relationship analysis from Montana, Strate, and other Supreme Court cases involving tribal authority of nonmembers on the reservation, the district court also reviewed Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982), which addressed the scope of tribal taxing powers.
In Merrion, the Supreme Court upheld an oil and gas severance tax imposed on non-Indian lessees extracting oil and natural gas from reservation deposits. The Court reasoned that the lessees ought to be subject to the tribe’s taxes because they “avail[ed] themselves of the ‘substantial privilege of carrying on business’ on the reservation” and “benefit[ted] from the provision of police protection and other governmental services, as well as from ‘ “the advantages of a civilized society” ’ that are assured by the existence of tribal government.” Id. at 137-38, 102 S.Ct. 894 (citations omitted). The Court recognized that a tribe’s power to tax “is an essential attribute of Indian sovereignty ... [and a] necessary instrument of self-government and territorial management.” Id. at 137, 102 S.Ct. 894. The Court explained further that a “tribe’s interest in levying taxes on nonmembers to raise ‘revenues for essential government programs ... is strongest when the revenues are derived from value generated on the reservation by activities involving the Tribes and when the taxpayer is the recipient of tribal services.’ ” Id. at 138, 102 S.Ct. 894 (quoting Washington v. Confederated Tribes of Colville Indian Reservation, 447 U.S. 134, 156-57, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980)). In its review of Merrion in this case, the district court acknowledged that Merrion involved tribal, and not fee, lands on the reservation. The district court concluded, however, that Merrion’s discussion was not necessarily limited to cases involving tribal lands because the Supreme Court characterized the tribe’s authority to tax non-Indians doing business on the reservation as “an essential attribute of sovereignty” and not merely an extension of a tribe’s power to exclude persons from its tribal lands. R., Vol. Ill at 924-25. Because the instant case involved a tax on commercial activity within reservation boundaries and because that tax was designed to sustain the tribe’s services in support of the tourist market, the district court determined that the provision-of-ser-viees and benefits-of-a-civihzed-society factors in Merrion would be relevant to its Montana consensual relationship analysis.
The district court also reviewed several other Supreme Court cases demonstrating *1255 the complexity of a proper Montana analysis, including Brendale v. Confederated Tribes and Bands of the Yakima Indian Nation, 492 U.S. 408, 109 S.Ct. 2994, 106 L.Ed.2d 343 (1989), Cotton Petroleum Corp. v. New Mexico, 490 U.S. 163, 109 S.Ct. 1698, 104 L.Ed.2d 209 (1989), and Colville, 447 U.S. at 156, 100 S.Ct. 2069. In Brendale, a majority of Supreme Court justices recognized that a tribe’s interest in zoning fee lands within a reservation became stronger as the impact of fee land activity on the tribe increased. See Brendale, 492 U.S. at 430-31, 109 S.Ct. 2994 (opinion of White, J.), at 437 & n. 2, 109 S.Ct. 2994 (opinion of Stevens, J.). In Cotton Petroleum, 490 U.S. at 186 & n. 17, 109 S.Ct. 1698, and Colville, 447 U.S. at 156, 100 S.Ct. 2069, the Court considered the effects and burdens of state and tribal taxes, discussed the relationship between those taxes and the services provided by the tribe, and directed that lower courts seek to accommodate tribal, state, and federal interests in their analyses of tribal self-government and taxing issues.[9]
After reviewing Montana, Strate, Memon, and the Supreme Court’s other Indian jurisdiction case law, the district court determined that “the real question with respect to tribal-taxation cases and the consensual-relationships test is whether the nonmembers’ consensual activity within Indian Country is significant enough to allow the tribe to tax that activity.” R., Vol. Ill at 925. The district court described the test in such cases as “a sliding scale, balancing the impact of the activity on the tribe with the severity of the tribe’s proposed regulation, taxation, or other imposition of jurisdiction.” Id. at 926. As applied by the district court, that balancing test required an examination of “the nature of the relationship between [Appellant’s] guests and the Tribe[] and the extent to which the Tribe provides services to those guests while they are on the reservation, compared to the burden placed on those guests by the [Hotel Occupancy Tax].” Id. We are convinced that the district court did not apply a standard to the Navajo Nation’s Hotel Occupancy Tax that was different from the one set forth in Montana. We believe the balancing test and the factors discussed by the district court in its consensual relationship analysis appropriately apply and complement the Supreme Court’s Indian law jurisprudence.
The district court did not discuss, however, what may be the most significant case illustrating the consensual relationship exception as it relates to tribal taxation of non-Indians on fee land Buster v. Wright, 135 F. 947 (8th Cir.1905). The Supreme Court cited Buster, an early Court of Appeals decision, in both Montana and Strate to illustrate a case in which a tribe may legitimately exercise its inherent sovereign powers to tax the activities of nonmembers who enter consensual relationships with the tribe, even those occurring on non-Indian fee land within the reservation. See Montana, 450 U.S. at 566, 101 S.Ct. 1245; Strate, 520 U.S. at 457, 117 S.Ct. 1404. The consensual relationship holding in Buster involved merchants and traders who were deemed liable to pay taxes for exercising a taxable privilege — that of conducting business within the boundaries of the Creek Nation. See Buster, 135 F. at 949-50, 953-54. The relationship was consensual because the nonmember business owners could “refrain from the [privilege] and ... [therefore] remainf ] free from liability for the [tax].” Id. at 949. In its reasoning, the Buster court considered the fee status of the land belonging to those nonmember business owners, but, more importantly, the court “place[d] clearly before our minds the character of the Creek Nation and the nature of the power which it [was] at *1256 tempting to exercise.” Id. at 950. In the process of weighing the two positions (those of the nonmember business owners and the tribe), the court held that “the governmental power of a nation is not limited to the occupants of the lands in its country which the nation itself owns, but extends to all the inhabitants of its territory.” Id. at 952.
The Eighth Circuit upheld the tax at issue in Buster because the tribe’s “authority ... to prescribe the terms upon which noncitizens may transact business within its borders” is “one of the inherent and essential attributes of its original sovereignty.” Buster, 135 F. at 950. The fact that the business owners within the borders of the Creek Nation owned their land in fee and the fact that the business transactions took place on fee land did not exempt the noncitizens from Indian jurisdiction. The court wrote that “the jurisdiction to govern the inhabitants of a country is not conditioned or limited by the title to the land which they occupy in it.” Id. at 951. It held that “the legal right to purchase land within an Indian nation gives the purchaser no right of exemption from the laws of such nation” and that “merchants and traders who had purchased or were occupying such lots were liable to pay the permit taxes of the tribe.” Id. at 953-54.
Our review of Buster is significant because that case, with its explicit approval by the Supreme Court, clearly rebuts Appellant’s primary argument that Montana, Brendale, South Dakota v. Bourland, 508 U.S. 679, 113 S.Ct. 2309, 124 L.Ed.2d 606 (1993), Strate, and Merrion should be read to establish one rule for assertions of tribal jurisdiction on fee land (Montana, et al.) and another rule for tribal land (Merrion). The Supreme Court’s use of Buster demonstrates that there is nothing inappropriate in reading those cases in harmony rather than cacophony.
The contrary reading of Supreme Court case law derives from an unwarranted reliance on a coincidence of facts and results detached from the reasoning of the Court. In the decisions noted above, the Court did make an issue of the fee status of the land in question. But nothing in them suggested that fee status is a limitation on the power to tax. The cases adverse to tribal jurisdiction merely prohibited either the exclusive restrictions on the use of the land itself or the use of lex loci to establish Indian jurisdiction over a tort case between two nonmember parties that was otherwise unrelated to tribal interests. In Brendale, for example, the Yakima Tribe sought to enforce its tribal zoning ordinance upon nonmember fee land even though the tribe’s ordinance conflicted with a county zoning ordinance covering the same property. See Brendale, 492 U.S. at 416, 109 S.Ct. 2994. Reliance on one Brendale majority’s conclusion that the Yakima Tribe “lacked authority to zone nonmembers’ fee land within an area of the reservation open to the general public,” see Dis. Op. at 1268, overlooks the conclusion of a differently comprised Bren-dale majority holding that the Yakima Tribe could, in fact, impose its zoning regulation upon nonmember fee land in the area of the reservation closed to the general public. See Brendale, 492 U.S at 441-44, 109 S.Ct. 2994 (opinion of Stevens, J.), at 468, 109 S.Ct. 2994 (opinion of Black-mun, J.). The comprehensive holding of Brendale demonstrates again how fee status is simply one factor a court should consider in applying the Montana framework and weighing the interests of the nonmembers against those of the tribe but not the determining factor. In Bourland, the Cheyenne River Sioux Tribe sought to prohibit hunters not holding tribal licenses from hunting on non-trust lands within the reservation. See Bourland, 508 U.S. at 685, 113 S.Ct. 2309. The Supreme Court held that the treaty rights on which the tribe relied to assert exclusive jurisdiction had been abrogated. However, the Bour-land Court left for resolution on remand the issue as to whether a Montana exception could be invoked to give the tribe jurisdiction over non-Indians on non-trust lands within the reservation. See id. at *1257 695-96, 113 S.Ct. 2309. In Montana itself, the Court considered only the tribe’s authority to prohibit all hunting and fishing by nonmembers on non-Indian property within reservation boundaries, and not the power to tax. See Montana, 450 U.S. at 547, 101 S.Ct. 1245. While the Strate case . did not involve the direct regulation of the use of nonmember fee land, the tribal court of the Three Affiliated Tribes in that case sought to assert jurisdiction over a tort claim between a nonmember plaintiff and nonmember defendants solely because the tort occurred within the boundaries of the reservation. See Strate, 520 U.S. at 447, 117 S.Ct. 1404. The Strate Court distinguished its result from Buster by contrasting the nature of the consensual relationships that existed in the two cases; it did not distinguish the two cases with any reference to fee status. See id. at 457, 117 S.Ct. 1404.
We acknowledge that the results in all four of these cases were adverse to the interests of Indian tribal jurisdiction. We believe, however, that the analysis set forth in these cases and others can be more accurately explained as instances in which the Supreme Court weighed the impact of the nonmember conduct against the severity of tribal regulations. This case-by-case approach seems clearly to have been the result the Montana Court intended when it held on the one hand that the “inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers,” but on the other hand that “Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands.” Montana, 450 U.S. at 565, 101 S.Ct. 1245 (emphasis added).
Even in cases that were resolved favorably for the tribes, the Supreme Court did not indicate that its decision turned on the point of trust land status. In Merrion, for example, the Court ruled that the tribe had the authority to tax transactions occurring on trust land in part because those transactions “ ‘significantly involv[ed]’ ” the tribe and its members and because “[t]he power to tax is an essential attribute of Indian sovereignty because it is a necessary instrument of self-government and territorial management [which] ... enables a tribal government to raise revenues for its essential services.” Merrion, 455 U.S. at 137, 102 S.Ct. 894 (discussing the holding in Colville, 447 U.S. at 152, 100 S.Ct. 2069). In Colville, the Supreme Court upheld a cigarette tax imposed on non-Indian customers purchasing cigarettes on trust lands and used Buster (which involved transactions between tribal nonmembers occurring on fee lands) to note how “[fjederal courts ... have acknowledged tribal power to tax non-Indians entering the reservation to engage in economic activity.” Colville, 447 U.S. at 153, 100 S.Ct. 2069 (citing Buster, 135 F. at 950).
The direction provided by Congress on the issue also indicates a tribal jurisdiction standard that is not based on a distinction between fee and tribal lands. In 1948, Congress enacted 18 U.S.C. § 1151 which defined “Indian Country,” and therefore the boundaries of Indian tribal jurisdiction, to include “all land within the limits of any Indian reservation ... notwithstanding the issuance of any patent.” See DeCoteau v. District County Court, 420 U.S. 425, 427 n. 2, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975). Although this definition was codified in the context of a primarily criminal statute, our circuit has held that “Indian tribes have jurisdiction over lands that are Indian country” and that § 1151, which defines Indian country, “applies to civil jurisdiction as well [as criminal jurisdiction].” Mustang, 94 F.3d at 1385 (citing DeCoteau, 420 U.S. at 427 n. 2, 95 S.Ct. 1082). In a 1962 case, the Supreme Court held that the enactment of § 1151 “squarely put to rest” the issue of whether land owned in fee fell outside tribal jurisdiction. Seymour v. Superintendent of Wash. State Pen., 368 U.S. 351, 357, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962); see also Hagen v. Utah, 510 U.S. 399, 425-26, 114 S.Ct. 958, 127 L.Ed.2d 252 (1994) *1258 (Blackmun, J., dissenting) (noting that as a result of 18 U.S.C. § 1151, “[Reservation boundaries, rather than Indian title, thus became the measure of tribal jurisdiction”); United States v. Baker, 894 F.2d 1144, 1149 (10th Cir.1990) (quoting Seymour to settle the issue “whether private property owned by non-Indians but situated within the boundaries of an Indian reservation is still ‘Indian country1 for jurisdictional purposes”). For this reason, the “chain of events that led to Appellant’s land falling within the exterior boundaries of the [Navajo] Nation’s reservation,” Dis. Op. at 1264, is essentially irrelevant. The key issue is the fact that the land is, without dispute, in Indian Country. Rather than support Appellant’s artificial dichotomy, § 1151 clearly precludes it. There is simply no authority for the position that the timing of a fee patent makes any difference in designating land on the reservation as Indian Country. To the contrary, Congress, in the exercise of its plenary authority, has determined that all lands within the outer bounds of the reservation are within Indian Country and are therefore subject to reasonable tribal authority.[10]
Because the issue is settled as to whether fee lands within the exterior boundaries of the reservation fall under the jurisdiction of the tribe, the only issue involved in this case is whether the tribe’s jurisdictional powers include the right to impose the tax at issue on nonmembers lodging on Appellant’s fee lands. Because the power to tax derives from the inherent powers of the tribe, not from the tribe’s power to exclude, the status of the land involved as fee land or tribal land is simply one of the factors a court should consider when determining whether a tax on nonmember activity on the reservation falls within the civil jurisdiction of the tribe.[11] Cf., e.g., Brendale, 492 U.S. at 432, 441, 109 S.Ct. 2994 (invalidating the tribe’s assertion of exclusive zoning authority over fee lands in the “open” portion of the reservation because the proposed development in that area “d[id] not imperil any interest of the Yakima Nation,” but granting the tribe exclusive zoning authority over fee lands within the “closed” portion of the reservation — i.e., that portion of the reservation closed to the general public — because the proposed development would endanger economically important timber production and threaten cultural and spiritual values of unique and undeveloped character of land). Buster and Merrion use similar language and similar analysis in their consideration of tribal taxing powers on activity taking place on fee lands and tribal lands, demonstrating the soundness of the district court’s conclusion in this case: “[T]he extent to which a tribe will be allowed to regulate or affect non-Indian activity is often determined on a sliding scale, balancing the impact of the activity on the tribe with the severity of the tribe’s proposed regulation, taxation, or other imposition of jurisdiction.” R., Vol. Ill at 926.
*1259 Contrary to the dissent’s suggestion, see Dis. Op. at 1268, the Supreme Court in Montana did not circumscribe the significance of its citation to Buster (with a parenthetical phrase, for example). The mere fact that the Court cited to page 950 of the Buster decision in no way implies that it did not approve of language from 951 of Buster holding that “the jurisdiction to govern the inhabitants of a country is not conditioned or limited by the title to the land which they occupy in it.” Buster, 135 F. at 951. The latter language is simply part of the same discussion that the Buster court began on page 950 to “place clearly before our minds the character of the Creek Nation and the nature of the power which it is attempting to exercise.” Id. at 950.
In Strate, the Supreme Court made Buster’s applicability abundantly clear by including parentheticals to explain its use of Buster and other cases to “indieate[] the type of activities the Court [in Montana ] had in mind” when it expounded the first exception to the Montana rule. Strate, 520 U.S. at 457, 117 S.Ct. 1404. The parenthetical in Strate explains that the Buster court “up[held] [the] Tribe’s permit tax on nonmembers for the privilege of conducting business within [the] Tribe’s borders” and “characterized as ‘inherent’ the Tribe’s ‘authority ... to prescribe the terms upon which noncitizens may transact business within its borders.’ ” Id. By pointing out both the consensual relationship between the tribe and nonmembers and the inherent qualities of a tribe’s authority to tax in its use of Buster to Alústrate the first exception to the Montana rule, the Supreme Court in Strate refutes the dissent’s suggestion that Buster is applicable only to illustrate what constitutes a consensual relationship. Furthermore, the dissent fails to explain how Strate or other Supreme Court cases limit the authority at issue in Buster which the Court described as “inherent”-the authority “to prescribe the terms of business within its borders.” Id.
Appellant attempts to distinguish Buster by arguing that the Creek Nation imposed its tax on nonmembers two years before the tribe “lost its unlimited sovereign power to regulate the conduct of nonmembers within its territory.” Appellant’s Reply Br. at 7. We reject this characterization of Buster. While the Creek Nation did enter into an agreement with the United States in 1901 to permit nonmembers to purchase lots within its territory, see Buster, 135 F. at 951, that agreement did not compromise the tribe’s sovereignty. The Court in Buster noted, “The theory that the consent ... to the conveyance of the title to lots or lands within [the tribal territory] ... exempts the ... owners or occupants of such lots from the exercise of all [the tribe’s] governmental powers ... is too unique or anomalous to invoke assent.” Id. at 952.
In additional attempts to distinguish this case from Buster, Appellant argues that in Buster “the non-members doing business within the Creek territory had actually purchased the land on which they were doing business directly from the tribe” and “the non-members had been aware of the tax and expressly agreed to it when purchasing their property.” Appellant’s Reply Br. at 7-8. These arguments do not provide any grounds for distinguishing the case at hand, however. In response to the first point, we acknowledge that the nonmembers in Buster did purchase their lots directly from the Creek Nation upon approval by the Secretary of the Interior, whereas Appellant’s land was granted to Appellant’s predecessor by the United States government. While Appellant might plausibly construe these facts to argue that in Buster the nonmembers “were in the tribe’s territory with the express permission of the tribe,” Id. at 8, the difference is insignificant. The critical facts in Buster were that the nonmember businesses were located within the boundaries of the Creek Nation and had entered into a consensual relationship with the tribe by exercising the taxable privilege of trading within those boundaries. As we stated above, Congress extinguished any distinction we might draw between Buster and the case at hand first, in 1934 when it *1260 extended the boundaries of the Navajo reservation by congressional act to include Appellant’s fee land, Act of June 14, 1934, ch. 521, 48 Stat. 960-62 (1934), and again, in 1948 when it defined Indian country to include “all land within the limits of any Indian reservation ... notwithstanding the issuance of any patent.” 18 U.S.C. § 1151; see also Seymour, 368 U.S. at 357, 82 S.Ct. 424. For legal purposes, the nonmembers in Buster and the Appellant in this case are identically situated on fee land within the boundaries of the tribe’s reservation.
Appellant’s second point is more plainly mistaken. To support its contention that the nonmembers in Buster had been aware of the tax and expressly agreed to it when purchasing their property, Appellant cites Buster, 135 F. at 954. In that portion of the opinion, the court did discuss “contracting parties” who were aware of the tax before entering an express agreement on that point. Id. The parties spoken of, however, are not the nonmember businessmen and the tribe. Rather, they are the United States and the Creek Nation. See id. The agreement mentioned is the agreement of 1901 between the United States and the Creek Nation that opened the way for nonmembers to purchase fee lots, not an agreement between any individual nonmember merchant and the tribe. See id. The dissent appears to perpetuate this error by presuming that “the consensual relationship in Buster was formed when the nonmembers purchased tribal land and/or when they chose to transact business with the tribe and its members.” Dis. Op. at 1268 n. 1. It is important to note, however, that the Buster court made no mention of any particular agreement, contract, or choice entered into by the nonmember businessmen constituting an express consensual relationship. In fact, the only description of the consensual relationship given in Buster is that “[t]he payment of this tax is a mere condition of the exercise of th[e] privilege [of trading within the borders of the Creek Nation].” Buster, 135 F. at 949. The Buster court noted that “[n]o noncitizen is required to exercise the privilege or to pay the tax. He may refrain from the one and he remains free from liability for the other.... [The tax] has the optional feature of [a license] and lacks the compulsory attribute of [an ordinary tax].” Id. Indeed, the only mention of explicit consent in Buster was that the tribe did not forfeit their sovereign powers over nonmembers on fee land within its borders by consenting to incorporate cities and otherwise convey lots to those nonmembers. See id. at 952.
Buster’s discussion of tribal sovereign powers is really no different from the Supreme Court’s discussion in Montana and elsewhere. In 1831, the Supreme Court declared Indian people’s status as “domestic, dependent nations.” Cherokee Nation v. Georgia, 30 U.S. (5 Pet.) 1, 17, 8 L.Ed. 25 (1831). Since that time, the tribes have remained distinct political entities, retaining their original sovereign authority to the extent Congress and the Supreme Court have permitted. See Montana, 450 U.S. at 565, 101 S.Ct. 1245 (reviewing Supreme Court case law that stresses “that Indian tribes cannot exercise power inconsistent with their diminished status as sovereigns”); Buster, 135 F. at 950. This case is not distinguishable from Buster on the grounds that the tax in Buster was imposed in a time of unlimited sovereign powers. Tribal sovereign powers have always had some limitation. The issue here is what those limits are, i.e., whether the Navajo Nation may impose its tax on the non-Indian guests visiting Appellant’s hotel situated on fee land within the boundaries of the Navajo Reservation.
Montana and Strate mandate that we permit the Navajo Nation to tax Appellant’s guests if the tax falls within the consensual relationship exception. Significantly, both cases cite Buster to illustrate the consensual relationship exception. See Montana, 450 U.S. at 566, 101 S.Ct. 1245; Strate, 520 U.S. at 457, 117 S.Ct. 1404. We are persuaded that the district court’s analysis conforms to the Supreme Court’s decisions in Montana, Strate, and Mer- *1261 ñon, and is consistent with its citations of Buster.
Onr reading of Supreme Court precedent rejects the arbitrary factual basis of fee status as the determinative factor of the Montana standard and leaves the Supreme Court’s Indian law jurisprudence more cohesive and intelligible. The primary considerations that the Supreme Court has taken into account in cases involving tribal jurisdiction and nonmembers on the reservation are (1) the status and conduct of the nonmembers and (2) the nature of the inherent sovereign powers the tribe is attempting to exercise, its interests, and the impact that the exercise of the tribe’s powers has upon the nonmember interests involved. Any accounting of fee status either falls into the Court’s study of these factors or becomes secondary. We therefore conclude that the district court was correct in applying the consensual relationship exception to the Navajo Nation’s Hotel Occupancy Tax as applied to Appellant and its guests.[12] A review of the record as it supports the district court’s application of facts to the three factors it derived from its Montana analysis will help illustrate our conclusion in this regard.
B.
Appellant argues that even if the district court’s review of the Montana rule and its exceptions were correct, the court erred in its application of the consensual relationship exception. More particularly, Appellant contends that the district court erred in concluding that a consensual relationship existed between the tribe and the hotel guests and in basing that conclusion at least partially on the grounds that the hotel guests drive on a public highway that passes over reservation land to reach Appellant’s businesses on fee land within the reservation. See Appellant’s Br. at 22, 24. Appellant’s arguments are again mistaken.
The district court did consider in its consensual relationship analysis the fact that Appellant’s guests travel by public highway onto the reservation in their visit to Appellant’s establishments (also known as the Trading Post). R., Vol. Ill at 917, 927. If that were the only factor the district court took into consideration when making its determination, its conclusion would probably be foreclosed by the Supreme Court’s holding in Strate. See Strate, 520 U.S. at 442, 117 S.Ct. 1404 (holding that a tribal court may not entertain an action against a nonmember arising out of an accident occurring on a por *1262 tion of a public highway that runs across the tribe’s reservation). The district court, however, addressed several more significant aspects of the guests’ relationship with the tribe. It discussed the extent of police, fire, emergency medical, and tourist services provided by the tribe to benefit Appellant and its guests at the Trading Post.[13] It ruled that by frequenting Appellant’s businesses on the reservation, staying overnight, and otherwise taking advantage of tribal services and the “establishment of a civilized society” on the reservation, those subject to the Navajo Hotel Occupancy Tax had actually entered into a consensual relationship with the tribe. See R., Vol. Ill at 927. In support of its ruling, the district court cited an analogy from New Mexico state law in which motorists driving in New Mexico are deemed to have given implied consent to breath tests for alcohol. Id. (citing N.M. Stat. Ann. § 66-8-107 (Michie 1998)). While it does not address directly the issue of implied consent, the court could also have cited New Mexico Statutes Annotated § 3-38-15 (Michie 1999 Supp.), which authorizes municipalities in New Mexico to impose an occupancy tax for revenues on lodging within their municipality in part because “[e]very vendor who is furnishing any lodgings within a municipality or county is exercising a taxable privilege.” The state of Arizona (where Appellant’s Trading Post is located) also levies a “transaction privilege tax” on transient lodging. Ariz.Rev.Stat. §§ 42-5008, -5010, -5070 (1999). The occupancy taxes authorized in Ariz.Rev.Stat. § 42-5010 and N.M. Stat. Ann. § 3-38-15 are applied to lodgers within Arizona and New Mexico municipalities in the same manner *1263 as the Navajo Hotel Occupancy Tax applies to Appellant’s lodgers on the Navajo Reservation.
The Navajo Nation in the case at hand is taxing the guests of Appellant’s hotel for the privilege of remaining on the reservation under the protection and accommodation of the services provided by the tribe. By enacting its Hotel Occupancy Tax, the Navajo Nation seeks to prescribe the terms of business between hotel owners and guests within its tribal borders. Cf. Strate, 520 U.S. at 457, 117 S.Ct. 1404 (affirming Buster’s holding that “the Tribe’s ‘authority ... to prescribe the terms upon which noncitizens may transact business within its borders” was “ ‘inherent’ ”). The consensual relationship between the guests and the tribe is one of implied consent, or privilege and tax, similar to that set forth in Buster: the consensual relationship exists in that the nonmember guests could refrain from the privilege of lodging within the confines of the Navajo Reservation and therefore remain free from liability for the Navajo Hotel Occupancy Tax. Cf. Buster, 135 F. at 949.
The district court’s ruling with regard to the consensual relationship between the tribe and the hotel guests subject to the Hotel Occupancy Tax does not offend the Montana consensual relationship exception or other notions of justice. The Montana exception contemplates the fact that “commercial dealing ... or other arrangements” may give rise to tribal jurisdiction under the consensual relationship exception. Montana, 450 U.S. at 565, 101 S.Ct. 1245. In the case before us, the tribe accommodates the activity of Appellant and its guests on the reservation. That activity is relevantly related to the tribe’s tax. We agree with the district court that, by making the trip to the reservation and staying overnight, “the guests voluntarily put themselves in the position of possibly needing assistance from tribal personnel.... In sum, the Tribe provides [Appellant’s] overnight guests with the ‘benefits of civilized society while the guests are present, and the presence of the guests creates a greater need, both actual and potential, for tribal services.” R., Vol. Ill at 927-28.
We conclude that the same principles apply as in those other cases in which hotel occupancy taxes have been subject to judicial review. See Noralyn O. Harlow, Annotation, Tax on Hotel-Motel Room Occupancy, 58 A,L.R.4th 274, 282, 1987 WL 419581 (“Hotel room occupancy taxes have been subject to a number of constitutional challenges which, with a few exceptions, have been rebuffed in the courts.”). As long as it does not appear that the hotel occupancy tax imposed by the tribe is an “arbitrary or capricious ... exercise[ ] of legislative power” and as long as the “benefits received and the burdens imposed [are not] disproportionate,” id. at 290-91, 297, a court may infer that by availing themselves of the services provided by the tribe, hotel occupants like those in this case enter into a consensual relationship with the tribe. See id. (reviewing cases holding that the imposition of a hotel occupancy tax does not “discriminate against nonresidents and therefore [does] not violate the equal protection clause of the Constitution” and is not an arbitrary or capricious exercise of legislative power so long as the benefits received and the burdens imposed are proportionate).
In the final step of its analysis, the district court considered “the extent to which the Tribe provides services to those guests while they are on the reservation, compared to the burden placed on those guests by the [Hotel Occupancy Tax].” R., Vol. Ill at 926. The court determined the burdens of the Navajo Nation’s tax were “minimal” because “[u]nlike zoning restrictions or hunting and fishing regulations, which directly restrict nonmembers’ ability to act or use their property in certain ways, the [Hotel Occupancy Tax] involves only the payment of a tax of 8% of the room rate.” Id. at 928. In its discussion of zoning, fishing, and hunting regulations, the district court distinguished this case from the factual scenarios of Montana, *1264 which involved a tribe’s attempt to prohibit the hunting and fishing by nonmembers on fee land within the reservation, see Montana, 450 U.S. at 566, 101 S.Ct. 1245, and Brendale, which involved a tribe’s attempt to impose exclusive zoning authority over fee lands within “closed” and “open” portions of the reservation. See Brendale, 492 U.S. at 432, 441, 109 S.Ct. 2994. We agree with the district court’s analysis and hold that this tax is neither an arbitrary and capricious exercise of power nor a disproportionate burden on those paying the tax. See id. at 290-91.[14]
In the one case discussed in the A.L.R. report above in which a court found that the burden was disproportionate, a county had imposed an occupancy tax on all hotels in the surrounding municipalities to fund a city convention center. The court found that “the class taxed are afforded no benefits whatsoever, while being significantly burdened.” Allegheny County v. Monzo, 509 Pa. 26, 500 A.2d 1096, 1104 (1985). This is not so in the case at hand. The Navajo Hotel Occupancy Tax “is imposed for the purposes of promoting tourism and tourism development,” a benefit to Appellant and its guests, and “to develop projects throughout the Navajo Nation.” Navajo Nation Code tit. 24, § 142(A)-(B). The district court noted that “the rate [of the Navajo Hotel Occupancy Tax] is lower than the occupancy-tax rate imposed by many municipalities”[15] and observed that Appellant “made no attempt to argue that there was a great disparity between the amount of the tax paid and the services provided by the Tribe.” R., Vol. Ill at 928. We are again persuaded by the district court’s analysis. The burden imposed on Appellant’s guests is not disproportionate to the benefits they receive by availing themselves of Navajo tribal services, including tourist services. The Navajo Nation’s tax is imposed on nonmembers who have entered an implied consensual relationship with the tribe and is used in ways that appropriately benefit the taxpayers.
We hold that as applied to Appellant’s guests, the Navajo Hotel Occupancy Tax falls under the consensual relationship exception of the Montana rule. The district court’s rulings are AFFIRMED.

. We note that when Appellant first brought its challenge in 1993, the rate of the tax was five percent. As originally enacted in 1992, the Hotel Occupancy Tax assessed five percent of the price paid for a room but provided that “[o]n January 1, 1994, the rate of the tax imposed by this chapter will increase to eight percent.” Navajo Nation Code tit. 24, § 103 (1995).
While the tax applies only to Appellant's guests, it requires that Appellant collect the tax, see id. §§ 104, 107, and provides a reimbursement for the costs of collecting. See id. § 109.

. The Navajo tribal code provides for appeal from the assessment of the Hotel Occupancy Tax. The prescribed procedure requires a first appeal to the Navajo Tax Commission and permits a second appeal to the Navajo Supreme Court which is empowered to affirm, reverse, remand, or modify a Commission action. See Navajo Nation Code tit. 24, *1250 § 131 (A)-(B) (1995). The Commission concluded that Appellant was subject to the provisions of the tax, see R., Vol. I at 404, and the Supreme Court also ruled against Appellant, affirming the decision of the Commission. See R„ Vol. II at 705.

. For a complete explanation of the "procedural nightmare” that developed, see National Farmers Union Ins. Companies v. Crow Tribe of Indians, 560 F.Supp. 213, 213-18 (D.Mont.1983), reversed 736 F.2d 1320 (9th Cir.1984), and National Farmers Union, 471 U.S. at 847-49, 105 S.Ct. 2447.

. Though Mustang did not speak to this exception explicitly, it is not difficult to extrapolate from our court’s opinion that if a nonmember party exhausting its remedies within the tribal system faces a fundamental unfairness or bias against it, the district court ought not give clear error discretion to the tribal court's findings of facts in its review of the tribal court's decision. See Mustang, 94 F.3d at 1384.

. With respect to the negative statements regarding the General Allotment Act and congressional policy surrounding it, the district court pointed out that those were "no more than restatements of a view held by many Indian and non-Indian scholars.” R., Vol. Ill at 916.

.Appellant also contends that the district court erred in denying its motion for summary judgment. For reasons that will become apparent in our discussion of the district court's grant of Appellee's motion for summary judgment, we need not consider the court’s denial of Appellant's motion.

. The Navajo Supreme Court came to the same conclusion in its consideration of Appellant's action. See R., Vol. II at 701.

. The district court did not rule out the possibility that the power to tax might arise from the second “significant-impacts” exception to the Montana rule. In fact, the Navajo Supreme Court held as much, concluding that "[tjaxation, that indispensable element of any government, surely has everything to do with the Navajo Nation's political integrity.” R., Vol. II at 702. The district court appeared to condone the Navajo Supreme Court's conclusion, stating that "[cjonsideration of the other half of the Montana test, the significant impacts factor, in an appropriate case may be sufficient to allow the tribe to impose its tax.” R., Vol. Ill at 927 n. 4. In our review of the district court’s opinion in this case, however, the applicability of the second exception to the Montana rule is not at issue. We therefore do not address its application to the Navajo Hotel Occupancy Tax.

. The district court also referenced Cohen’s Handbook of Federal Indian Law which characterized the Montana and Colville holdings as "recognizing] that tribal power can extend to activities of nonmembers on fee lands [within the reservation] but only if there is a tribal interest sufficient to justify tribal regulation.” Felix S. Cohen, Handbook of Federal Indian Law 256 (Rennard Strickland & Charles F. Wilkinson eds., 1982).

. In fact, the Montana Court indicated that its decision to deny the Crow Tribe power to regulate hunting and fishing on fee lands within the reservation might have been different had the statute at issue incorporated a reference to § 1151. The Court stated, “If Congress had wished to extend tribal jurisdiction to lands owned by non-Indians [in its statute that prohibited unauthorized hunting, trapping, or fishing on tribal lands, 18 U.S.C. § 1165], it could have easily have done so by incorporating in § 1165 the definition of 'Indian country’ in 18 U.S.C. § 1151.” Montana, 450 U.S. at 563, 101 S.Ct. 1245.

. The dissent mistakenly asserts that our opinion "concludes it is irrelevant whether the nonmembers’ conduct takes place on tribal land or non-Indian fee land.” Dis. Op. at 1267. Our position is not that fee status is irrelevant. Fee status is largely inconsequential in this case simply because the Navajo Hotel Occupancy tax is not a severe imposition upon Appellant’s guests and because the subject matter of the tax was more a commercial transaction than one affecting the actual use of Appellant's land. In sum, fee status is plainly relevant in applying the Montana standard and its exceptions, but it is not determinative to the extent that the analysis of the Supreme Court turns on that point alone.

. Appellant argues that because the Hotel Occupancy Tax requires both Appellant and its guests to take certain actions, the Navajo Nation must establish jurisdiction over both Appellant and its guests. See Appellant’s Br. at 15. While the Navajo Supreme Court held that under Montana the tribe had the authority both to impose its Hotel Occupancy Tax on Appellant’s non-Indian guests and to require that Appellant collect and remit the tax, see R., Vol. II at 705, the district court applied its Montana rule analysis as if the only issue were the Nation’s assertion of jurisdiction over Appellant's hotel guests. See R., Vol. Ill at 920, 929. The question is not really as significant as Appellant suggests. The district court found that the Nation had authority to impose the tax on the guests under the Montana consensual relationship test. We note simply that if there is a sufficient consensual relationship between the Nation and Appellant’s guests, there is certainly a sufficient consensual relationship between the Nation and Appellant, which, as a corporation operating several businesses on the reservation, has a consensual, relationship more explicit than its guests, benefits far more from the provision-of-services and benefits-of-a-civilized-society factors discussed by the district court, and is actually reimbursed for the costs of collecting the tax. See Navajo Nation Code tit. 24, § 109 (1995).
The district court did question the extent to which Appellant had standing to challenge the Hotel Occupancy Tax, noting that Appellant's standing was "not entirely clear.” R., Vol. Ill at 919. The court reasoned, however, that because the Navajo Nation failed to raise the issue, it failed to give Appellant opportunity to establish standing in the factual record, and the court did not address the issue further. Id. at 919-20. Because the Navajo Nation requires Appellant to collect the tax and because those most affected are Appellant’s guests, we have no reason to suppose that Appellant lacks standing.

. Reviewing the Navajo Tax Commission’s factual findings, the district court reported:
Plaintiffs customers travel on reservation land to reach the Trading Post, either on a federal highway or a state highway. These highways pass over rights-of-way granted by the Tribe. The highways are jointly patrolled by the Arizona state, and Navajo tribal, police, but the tribal police force is the primary provider of police protection to the Trading Post and the immediate vicinity. A substation of the Tribe’s Tuba City police department is located in Cameron [the town in which Appellant’s Trading Post is located]. When a 911 call is placed from the Post, the call is referred to the tribal police for first response. In addition, the Post has an alarm system that triggers calls to the tribal police. That is, when the alarm goes off, the operator of the alarm system calls the tribal police, rather than a non-tribal law enforcement office, to request a response. The Trading Post has a non-loitering policy, and tribal police enforce that policy by requiring juveniles and others that are “hanging out” to move off the Post's property. Tribal police provide assistance to motorists on the highways leading to the Trading Post, including giving directions and changing flat tires.
Fire protection in the area of the Trading Post is provided jointly by the tribal fire department in Tuba City, located about 25 miles from Cameron; the Bureau of Indian Affairs ("BIA”) fire department (also located in Tuba City); a fire department called the Timberline department that is located 45 miles from Cameron; and the Grand Canyon fire department, located over 50 miles from Cameron. The tribal and BIA departments cooperate closely with each other, and provide the primary response to calls from the Cameron area. There has been at least one fire at the Trading Post, to which the tribal fire department as well as the Timberline department responded.
Emergency medical services in the Cameron area are provided by a tribal entity called the Emergency Medical Services Department (“EMS”). EMS maintains two ambulances in Tuba City. EMS responds to all calls from locations within the Navajo Nation, and has responded to numerous calls concerning automobile accidents in the Cameron area. The tribal police and fire departments have also received and responded to many auto accident calls in the area, involving both Navajos and non-Navajos. If the state police called Flagstaff emergency services instead of the tribal EMS, however, the Flagstaff unit would respond to the call.
The Navajo Nation has a tourism department that provides information to prospective visitors over the telephone or through brochures. That department is also attempting to stimulate tourism by developing “vendor villages” in several locations on the reservation that receive heavy tourist use, including the Cameron area.
R., Vol. Ill at 917-19 (footnote omitted); see also R., Vol. I at 393, 397-401 (the Navajo Tax Commission’s findings of fact).

. While several cases use various nomenclature to describe the precise nature of the tax in question, we do not find it necessary to construe the Navajo Hotel Occupancy Tax for purposes of our holding. Cf. Harlow, supra, 58 A.L.R.4th at 282 (noting that "[t]he variety of nomenclature reflects an equally diverse judicial view of the nature of the tax, which has been held under various circumstances to be a sales tax ... a privilege tax ... a license tax ... an income tax ... or an excise tax”).

. The district court appears to have made this conclusion based on a review of occupancy tax rates outside the states of New Mexico and Arizona. The statute authorizing municipalities in New Mexico to impose an occupancy tax limits that tax to "five percent of the gross taxable rent.” N.M. Slat. Ann. § 3-38-15 (Michie 1999 Supp.). Arizona levies a five and one-half percent tax on transient lodging. See Ariz.Rev.Stat. § 42-5010(A)(2) (1999). Statutes in other states, however, authorize occupancy taxes at rates varying between one and fifteen percent. See, e.g., La.Rev.Stat. Ann. § 2740.18(A)(1) (West 1999) (authorizing parishes to impose a one percent occupancy tax); Tex. Tax Code Ann. § 351.0025(b) (authorizing an occupancy tax up to fifteen percent of price paid for room) (West 1999); Vt. Stat. Ann. tit. 32, § 9242(c) (1998) (levying a tax of nine percent on occupancies in the state); Va.Code Ann. § 58.1-3819 (Lexis 1999) (authorizing more populated counties to impose an occupancy tax of up to five percent).